## MANCHESTER v. MASSACHUSETTS.

ERROR TO THE SUPERIOR COURT OF THE STATE OF MASSACHUSETTS FOR THE COUNTY OF BARNSTABLE.

No. 1518. Argued January 14, 15, 1891. — Decided March 16, 1891.

The act of the Legislature of Massachusetts, approved May 6, 1886, (Laws of 1886, c. 192,) "for the protection of the fisheries in Buzzard's Bay," is valid, so far as it relates to the taking of menhaden.

It applies to a vessel which has a license to fish for menhaden under the laws of the United States.

As between nations, the minimum limit of the territorial jurisdiction of a nation over tide-waters is a marine league from the coast; and bays wholly within its territory which do not exceed two marine leagues in width at the mouth are within this limit; and included in such territorial jurisdiction is the right of control over fisheries.

The courts of Massachusetts can lawfully take jurisdiction of violations of such statutes, as against the admiralty and maritime jurisdiction of the courts of the United States.

It has always been the doctrine of this court, that whenever a conflict arises between a State and the United States, as to the regulation of commerce or navigation, the authority of the latter is supreme and controlling.

Within what are generally recognized as the territorial limits of States by the law of nations, a State can define its boundaries on the sea and the boundaries of its counties; and by this test Massachusetts can include Buzzard's Bay within the limits of its counties.

There are no existing treaties or acts of Congress which relate to the menhaden fisheries within such a bay as Buzzard's Bay.

The question is not considered whether or not Congress would have the right to control the menhaden fisheries in question.

By an act of the legislature of the Commonwealth of Massachusetts, approved May 6, 1886, (Laws of 1886, c. 192,) entitled "An act for the protection of the fisheries in Buzzard's Bay," it was enacted as follows:

"SECTION 1. No person shall draw, set, stretch or use any drag net, set net or gill net, purse or sweep seine of any kind for taking fish anywhere in the waters of Buzzard's Bay within the jurisdiction of this Commonwealth, nor in any harbor, cove or bight of said bay except as hereinafter provided.

"Section 2. Any net or seine used in violation of any provision of this act, together with any boat, craft or fishing apparatus employed in such illegal use, and all fish found therewith, shall be forfeited; and it shall be lawful for any inhabitant or inhabitants of any town bordering on said bay to seize and detain, not exceeding forty-eight hours, any net or seine found in use contrary to the provisions of this act, and any boat, craft, fishing apparatus and fish found therewith, to the end that the same may be seized and libelled if need be by due process of law.

" Section 3. All nets and seines in actual use set or stretched in the waters aforesaid in violation of this act are declared to be common nuisances.

" Section 4. Nothing contained in this act shall be construed to interfere with the corporate rights of any fishing company located on said bay nor in any way to affect the fish weirs mentioned in section seventy of chapter ninety-one of the Public Statutes, nor the use of nets or seines in lawful fisheries for shad or alewives in influent streams of said bay, nor to the use of set nets or gill nets in the waters of the town of Fairhaven within a line drawn from Commorant rock southwesterly to the buoy on West Island Rips and from thence westerly in a straight course through the buoy on West Island Ledge to the town line of Fairhaven.

" Section 5. Whoever violates any provision of this act or aids or assists in violating the same shall pay a fine not exceeding two hundred dollars for each offence.

" Section 6. District courts and trial justices shall have concurrent jurisdiction with the Superior Court of all offences and proceedings under the provisions of this act.

" Section 7. All fines received under this act shall be paid one-half to the complainant and the other half to the Commonwealth. All moneys from any forfeitures incurred under this act shall inure and be paid one-fourth to the informer and one-fourth to the person filing the libel and the other half to the Commonwealth."

Under that statute, a complaint in writing under oath was made on behalf of the Commonwealth, before a trial justice

in and for the county of Barnstable, in Massachusetts, that
Arthur Manchester, at Falmouth, in the county of Barnstable,
on the 19th day of July, in the year 1889, did then and there
draw, set, stretch and use a purse seine for the taking of fish
in the waters of Buzzard's Bay, within the jurisdiction of the
Commonwealth. Under a warrant issued on this complaint,
Manchester was, on the 1st of August, 1889, brought before
the trial justice, and pleaded not guilty. The justice found
him guilty, on a hearing of the case, and imposed upon him
a fine of $100, to the use of the Commonwealth, and costs,
and ordered that, if the fine and costs should not be paid, he
should be committed to jail, there to be kept until he should
pay them, or be otherwise discharged by due course of law.

The defendant appealed to the Superior Court of Barnstable
County. In that court, the case was, according to the statute,
tried by a jury, which found the defendant guilty. That court
reported the case for the determination of the Supreme Judi-
cial Court of the Commonwealth, which heard it, and on the
18th of September, 1890, made an order that judgment should
be rendered on the verdict. On the rescript being received by
the Superior Court, it affirmed the judgment of the trial jus-
tice, and directed the defendant to pay a fine of $100 and the
costs of prosecution, and stand committed until he should
comply with the order.

The report of the Superior Court, signed by a justice thereof,
was as follows: " This was a complaint under section 1 of
chapter 192 of the statutes of 1886. A copy of the complaint
is annexed and made a part of this report. The evidence of
the Commonwealth tended to show that the defendant and
others, who were citizens of Rhode Island and were officers
and crew of the fishing steamer called the ' A. T. Serrell,' on
the day named in the complaint were engaged in drawing,
setting, stretching and using a purse seine for the taking of
fish in the waters of Buzzard's Bay. The place where the
defendant was so engaged with said seine was about, and not
exceeding, one mile and a quarter from a point on the shore
midway from the north line of said town to the south line
thereof. The point where the defendant was so using said

seine was within that part of Buzzard's Bay which the harbor
and land commissioners, acting under the provisions of section
2 of chapter 196 of the acts of the year 1881, had, so far as
they were capable of doing so, assigned to and made a part of
the town of Falmouth.  A copy of the map showing boundary
lines between the adjacent cities and towns bordering on Buz-
zard's Bay, as so located by said commissioners, was used at
the trial and may be referred to.  The point where the defend-
ant was using said seine is marked ' A ' on said plan.  The
Commonwealth's evidence tended to show that the defendant
and his associates, on said day and at the point described,
caught with said seine a large quantity of the fish called men-
haden.   In this act of fishing no fixed apparatus was used and
the bottom of the sea was not encroached upon or disturbed.
The Commonwealth further offered evidence tending to show
that the distance between the headlands at the mouth of Buz-
zard's Bay, viz., at Westport, in the county of Bristol, on the
one side, and the island of Cuttyhunk, in the county of Dukes,
on the other side, was more than one and less than two marine
leagues.   The island of Cuttyhunk is the most southerly of
the chain of islands lying to the eastward of Buzzard's Bay,
and known as the Elizabeth Islands.   The distance across said
bay at the point where the acts of the defendant were done is
more than two marine leagues, and the opposite points are in
different counties.   The defendant did not dispute any of the
testimony offered by the Commonwealth, but introduced evi-
dence tending to show that he was engaged in fishing for
menhaden only, and that he caught no other fish excepting
menhaden ; that menhaden is not a food fish and is only valu-
able for the purpose of bait and of manufacture into fish oil ;
and that the taking of said menhaden by seining does not tend
in any way to decrease the quantity and variety of food fishes.
The defendant offered evidence further tending to show that
he was in the employ of the firm of Charles Cook and others,
who were engaged in the State of Rhode Island in the business
of seining menhaden to be sold for bait and to be manufac-
tured into fish oil and fish manure.  The defendant further
offered testimony tending to show that it was impossible to

discern objects across from one headland to the other at the mouth of Buzzard's Bay. The defendant's evidence showed that the said steamer was of Newport, Rhode Island, duly enrolled and licensed at that port, under the laws of the United States, for carrying on the menhaden fishery, and it was conceded by the Commonwealth that the defendant was employed upon the vessel described by said enrolment and license, and, at the time of the commission of the acts complained of, he and his associates were so in the employ of the vessel described in said license. The district attorney stated that he should not controvert any of the foregoing evidence, but claimed that it was incompetent in defence of this complaint; but for the purposes of the trial I admitted the testimony. The foregoing is all the evidence offered at the trial of this complaint. It was conceded that the defendant could not be convicted if chapter 212 of the acts of 1865 was not repealed by the statute of 1886, chapter 192. At the conclusion of the evidence the defendant asked me to rule as follows: 1. As the government does not claim that the act complained of is in violation of any statute except of chapter 192 of the acts of 1886, the defendant, notwithstanding that statute, is authorized to take menhaden by the use of the purse seine, in the waters of Buzzard's Bay in the place where this act was committed. 2. Chapter 192 of the acts of the year 1886 did not repeal chapter 212 of the acts of the year 1865. 3. The defendant may lawfully take menhaden, by the use of the purse seine, in Buzzard's Bay, in the place where the acts complained of in this case were done. And also: 1. The act complained of was on the high seas and without the jurisdiction of Massachusetts. 2. The act complained of having been done under a United States license for carrying on this fishery, the defendant cannot be held as a criminal for violating a statute of this Commonwealth. 3. The defendant cannot be held unless the act complained of was done and committed within the body of a county, as understood at common law. 4. The statute of this Commonwealth prohibiting under a penalty the use of nets and seines and the taking of fish within three miles of the shore is invalid, especially as against a license to fish granted

under the laws of the United States.   The defendant further asked me to rule that on all the evidence the defendant could not be convicted. . I declined to rule as requested by the defendant and submitted the case to the jury, with the instruction that the statute of 1865 was repealed by the statute of 1886, and with the instruction that, if they found 'that the defendant was engaged in using a purse seine for the taking of fish of any kind in that part of Buzzard's Bay which was within the jurisdiction of the Commonwealth of Massachusetts, they would be authorized to convict the defendant, and that the place where the acts of the defendant were committed, being within a marine league from the shore at low-water mark, was within the jurisdiction of the Commonwealth.  The jury returned a verdict of guilty ; and now, after verdict and at the request of the defendant, and by the consent of the parties, I report the case, with my rulings at the trial of the same, for the determination of the Supreme Judicial Court."

The Supreme Judicial Court held the statute in question to be constitutional and valid, and delivered an opinion, by Chief Justice Field, which is reported in 152 Mass. 230.

The defendant sued out a writ of error directed to the Superior Court, to review its judgment, and assigned as errors, that the court ruled and adjudged : " 1. That the place where the alleged offence was committed was not a part of the high seas and was not, under article 3, section 2, of the Constitution, which provides that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction, within the exclusive jurisdiction of the federal government. 2. That said place, notwithstanding said provision of the Constitution, was within the jurisdiction of Massachusetts.    3. That the plaintiff in error was not authorized to do the act complained of by a license under Title 50 of the Revised Statutes, and was not protected by such license.   4. That chapter 192 of the acts of the General Court of Massachusetts for the year 1886, as construed by the court, was valid notwithstanding the provisions of the Constitution and laws above cited, or any provisions of the Constitution and laws of the United States."

*Mr. Joseph H. Choate* and *Mr. James F. Jackson* for plaintiff in error.

I. At the time of the treaty of Paris, in 1783, the territorial domain of England extended upon her coast to low-water mark, including all bays, harbors and inlets within the "*fauces terræ,* where a man can reasonably discern from shore to shore."

Within these limits was "the body of the county." Within them the title to tide waters and the soil beneath was in the crown.

Without these limits were the "high seas," the common property of all nations. Over them England, as one of the common sovereigns of the ocean, had certain rights of jurisdiction and dominion derived from and sanctioned by the agreement of nations, express or implied.

Such jurisdiction and dominion she had for all purposes of self-defence and for the regulation of coast fisheries.

The exercise of such rights over adjacent waters would not necessarily be limited to a three-mile belt, but would undoubtedly be sanctioned as far as reasonably necessary to secure the practical benefits of their possession.

If self-defence or regulation of fisheries should reasonably require assumption of control to a greater distance than three miles, it would undoubtedly be acquiesced in by other nations.

The *marine-league* distance has acquired prominence merely because of its adoption as a boundary in certain agreements and treaties and from its frequent mention in text books, but has never been established in law as a fixed boundary.

These rights belonged to England as a member of the family of nations, and did not constitute her the possessor of a proprietary title in any part of the high seas nor add any portion of these waters to her realm. In their nature they were rights of dominion and sovereignty rather than of property.

This question is very fully considered and the authorities examined in a recent case. *Regina* v. *Keyn,* 2 Ex. D. 63.

The law of England was introduced and established in the colonies. The characteristic features of the property title of

the crown in the seashore, with its limit at low-water mark, were recognized as distinguished from the peculiar rights of sovereignty called "regalia." *Commonwealth* v. *Alger*, 7 Cush. 53, 83; *Commonwealth* v. *Roxbury*, 9 Gray, 451; *Martin* v. *Waddell*, 16 Pet. 367.

The distinction between *high seas* and *tide waters within the body of the county* has been generally recognized. *Commonwealth* v. *Peters*, 12 Met. 387; *United States* v. *Grush*, 5 Mason, 290; 1 Kent Comm. 396.

Such, then, was the territorial domain and such the extraterritorial right of jurisdiction which Massachusetts possessed and could have exercised as an independent State when she adopted the federal Constitution.

As an independent nation she could have undoubtedly enacted a statute like the one under discussion, which her own courts would have enforced and which other nations would have recognized.

II. To what extent did she under the Constitution surrender this right of control over the fisheries of the ocean?

(1) Whatever dominion or rights exist in the high seas are determined by international law and rest solely upon the common consent of nations, which may be express, but is more generally implied.

Whatever of such rights Massachusetts possessed previous to the formation of the federal government she possessed wholly by virtue of an agreement between herself as a nation and other nations.

When she became a State in the Union she not only on general principles merged her nationality in that of the United States, but by express concession she agreed to these clauses of the Constitution. Art. I., section 10. "No State shall enter into any treaty, alliance or confederation." "No State shall without the consent of Congress enter into any agreement or compact with another State or with a foreign power."

Thus Massachusetts was cut off from entering into such agreements with foreign nations as make up the body of international law. Not only could she enter into no new agreement, but the continuance of existing agreements and

contractual relations was terminated. When Massachusetts adopted the Constitution she gave up her international dealings and ceased to be a party to the usages and agreements by which they are governed.

The control over the fisheries of the ocean, resting as it did upon such agreement and usage, was surrendered with the power to contract with other sovereign States. This was not a surrender of territory that belonged to her, but of dominion over the common territory of the nations. Her title to her own territory, as known and defined by law, she still retained. Story on Const. § 1673.

"The Pacific Ocean belongs to no one nation, but is the common property of all." *Lord* v. *Steamship Co.* 102 U. S. 541. Is every seaboard State of the Union one of these owners and the United States without such ownership? Do these States have the right to take possession and control of the high seas as far as they shall see fit and assert each its own ideas and claims of right under international law and usage? Are the inland States without interest or authority in this common ocean and what it contains?

It is certainly a subject of more or less disagreement between nations how far rights of dominion upon the sea extend, giving rise to various assertions and claims. No absolute limit has yet been fixed upon. Nothing more has thus far been settled than that these rights extend to at least three miles from shore.

It is difficult to believe that this question is one to be settled between foreign nations and each of the seaboard States dealing with one another as common sovereigns of the sea. We contend, on the contrary, that rights over the waters' adjacent to our coast and a part of the ocean, " the property of no one nation," are rights of dominion recognized and established between nations by virtue of their national character and to determine international relations; that as such the merging of the national character by the several States into the United States by the adoption of the Constitution transferred by necessary implication and express provision the exercise of these rights.

(2) Another clause of the Constitution is to be considered : " The judicial power shall extend to all cases of admiralty and maritime jurisdiction." Constitution, Art. III., sec. 2.

This grant to the federal head of the power to establish the only courts which had any jurisdiction whatever upon the high seas is only consistent with the view that the rights to be protected were national rights and should be enforced in national courts. *Commonwealth* v. *Peters*, 12 Met. 387 ; 1 Kent Com. 367, 397 ; *United States* v. *Grush*, 5 Mason, 290 ; Story Const. § 1673.

The distinction between the jurisdiction left in the States over localities within their territory, within the body of a county, and the jurisdiction transferred to the United States is clearly stated in *Commonwealth* v. *Peters*, where the chief justice says : " Supposing the case stood upon the Constitution of the United States alone, without any legislation by Congress, the natural conclusion would be that the purpose of the Constitution was to transfer to the government of the United States all the admiralty and maritime jurisdiction over cases, civil and criminal, which had been exercised in England by the courts of admiralty and the special commissioners for the trial of maritime causes, and that all other judicial power would remain to the State. This would leave the courts of the State all the jurisdiction of all cases occurring upon rivers and other places within the ebb and flow of the tide lying within the body of any county."

This clause is not to be construed as a " cession of the waters," but simply of jurisdiction. The State did not own the ocean and had no waters to cede.

Nor is it contended that the jurisdiction of a State is not " coextensive with its territory." Our argument is that the territory of Massachusetts was defined under the law of England, and that when she adopted the Constitution her domain was limited, as far as proprietary title is concerned, by the body of the county, in accordance with the established principles of that law.

It was *without this territory* that the offence with which Manchester is charged took place, in a locality where legisla-

tive control did not rest upon title in the soil and waters, but upon rights of sovereignty inseparably connected with national character, and which had always been exclusively intrusted to enforcement in admiralty courts. The transfer of the power to establish these courts, with their recognized exclusive jurisdiction over the high seas, was equivalent to the transfer of the right of control over those seas.

This view is in accord with the decisions of the courts. In all cases when the state courts have been held to have jurisdiction, the locality has been admitted to be within the territorial boundaries of the State.

Within such boundaries the common law courts of the State continue to have jurisdiction, the State continues to own her fisheries. *United States* v. *Bevans*, 3 Wheat. 336, 387; *Smith* v. *Maryland*, 18 How. 71. In the latter case Mr. Justice Curtis says " this power results from the ownership of the soil."

It is true that *within the tide waters of the State* " there has been no grant of power over the fisheries " to the United States. *McCready* v. *Virginia*, 94 U. S. 391. That the State had no jurisdiction upon the ocean within three miles of shore was necessarily the decision of the court in the application of the Crimes Act of 1790 to an offence off Newburyport. *United States* v. *Smith*, 1 Mason, 147 ; *United States* v. *Kessler*, Baldwin, 15, 35. Could Massachusetts, under chapter 289 of the acts of 1859, oust the United States of its jurisdiction?

The transfer of this exclusive jurisdiction over the high seas to the national courts was consistent with the true purposes of the Union. Such jurisdiction belongs to the federal authorities for the best of reasons. Story Const. § 1673. The admiralty jurisdiction of the United States, as compared with that of England, has been *extended* but never *abridged*.

(3) " The Congress shall have power to regulate commerce with foreign nations and among the several States." Fishing upon the high seas is in its nature an integral part of national commerce, and its control and regulation are necessarily vested in Congress and not in the individual States. To secure the benefit of such national control and regulation of the fisheries was one of the express purposes of the Union.

The fisheries of the ocean were viewed as of national importance, as one of the principal sources of maritime power and of interstate and foreign commerce, and it was believed that one of the great benefits to be obtained from the federal union was to be *their control by a uniform law and protection by national authority.* The taking of fish in the ocean is an act necessarily bringing those engaged in it into contact with other nations. What is true of the simple act of navigation upon an ocean is still more true of fishing there. See *Lord* v. *Steamship Co.*, 102 U. S. 541. Can there be any doubt, following the reasoning in that case, that the control of the vessels engaged in taking menhaden upon the high seas is vested exclusively in Congress as a part of our external commerce?

The principles to be applied under this clause of the Constitution have been stated in many cases and very fully in the recent case of *Robbins* v. *Shelby Taxing District*, 120 U. S. 489. From the principles there laid down it would seem to be free from doubt that the *ocean fisheries* or *coast fisheries*, as they are termed, are national in character and in importance.

They were so considered previous to and at the formation of the Constitution; they have been ever since a most important feature of national policy and occupied prominent position in our treaties; they "enter into the national policy, affect national rights, and may compromit the national sovereignty;" in the taking of the fish and in the navigation of the ocean they are inseparably connected with the interests of the country as a whole and its people as citizens of the United States; they constantly bring those engaged in this branch of commerce in contact with the rights and privileges of other nations.

That the welfare of these national industries requires one uniform system of regulation seems apparent.

Whether it be mackerel, cod or menhaden fisheries, what more embarrassing and destructive of their proper conduct than to have twenty-two different systems of laws and regulations controlling the same industry along our shores?

Nothing is more certain than that the just regulation of

different fisheries demands careful investigation into the facts relating to them, freedom from prejudiced and vexatious local legislation, and a protection that can only be secured from congressional control.

This question does not affect menhaden fisheries alone, but the mackerel, cod, and other fisheries as well. The fickleness and injustice of state legislation must always subject to the varying whims of local ignorance or prejudice an important industry, involving the outlay of a large amount of capital, upon which great commercial interests depend, an industry fruitful, too, of national blessing, in the building of ships and in the education of mariners.

Moreover, even if the subject matter of ocean fisheries were deemed to be of such a nature that the States might make and enforce regulation thereof until the contrary intent of Congress appeared, the purpose of Congress to take this regulation into its own control has been plainly manifested.

Under its joint resolution of February 9, 1871, in establishing the Fish Commission, and under Title LI of the Revised Statutes, entitled "Regulation of the Fisheries," it has assumed the regulation of the coast fisheries in all such respects as are covered by the Massachusetts statute under which Manchester was convicted. It has made it the duty of the Fish Commissioner to investigate the facts and report whether any, and, if so, what, protective, prohibitory or precautionary measures shall be adopted in the premises.

This must have been done with a view of passing all such laws as should be necessary for the protection of the food fishes of the coast.

Again Congress took action in the enactment of chapter 288 of the statutes of 1887 relating to the mackerel fisheries.

It took action under the statutes relating to bounties, privileges and agreements in 1792, in 1793 and in 1813, and in the granting of the license under which the plaintiff in error was fishing.

Whatever construction has been put upon such a license in cases where the rights of the licensee have been affected by state legislation, it has never been denied that such a

license is a grant of authority, as held in *Gibbons* v. *Ogden*, 9 Wheat. 1.

When Congress enacted the law under which the plaintiff in error took out his license its power to regulate this fishery was exercised, and no prohibitory statute of a State could defeat his right to fish in the *high seas* under it.

In the case of *Smith* v. *Maryland*, where such a license was considered, the locality was admittedly within the territory of the State and the state law was held valid under its right to protect its own territory and property.

In each of the cases relating to the regulation of shell fish the decision rests upon a state of facts in which it is conceded that the fish were within the territory and soil of the State.

We do not question the right of the State to regulate its own fisheries within its own soil or tide waters.

The United States has in her treaties with foreign powers several times disposed of these fisheries as though they belonged to her and not as though they were the property of the individual States.

Commerce with the nations is constantly concerned with them, either through rights and privileges determined by treaties or those determined by the general consent of the common sovereigns of the ocean.

The menhaden fishery, with all its ramifications, inseparably connected as it is with the food fisheries and markets of the world, is practically destroyed by such legislation as that of Massachusetts, based upon an unjust discrimination and lack of such investigation as is being now carried on by authority of Congress.

It is the exclusion by the State of an important business connected with the commerce of the nations, authorized by national license, not from its own domain, where it might be claimed to be a matter of internal concern, but from the high seas, where it is necessarily a matter of external concern and carried on in contact with and together with all mankind.

*Mr. Henry C. Bliss*, Assistant Attorney General of Massachusetts, with whom on the brief was *Mr. Andrew J. Water-*

*man*, Attorney General of that Commonwealth, for defendant in error.

Mr. Justice Blatchford, after stating the case, delivered the opinion of the court.

The principal contentions in this court on the part of the defendant are that, although Massachusetts, if an independent nation, could have enacted a statute like the one in question, which her own courts would have enforced and which other nations would have recognized, yet when she became one of the United States, she surrendered to the general government her right of control over the fisheries of the ocean, and transferred to it her rights over the waters adjacent to the coast and a part of the ocean; that, as by the Constitution, article 3, section 2, the judicial power of the United States is made to extend to all cases of admiralty and maritime jurisdiction, it is consistent only with that view that the rights in respect of fisheries should be regarded as national rights, and be enforced only in national courts; that the proprietary right of Massachusetts is confined to the body of the county; that the offence committed by the defendant was committed outside of that territory, in a locality where legislative control did not rest upon title in the soil and waters, but upon rights of sovereignty inseparably connected with national character, and which were intrusted exclusively to enforcement in admiralty courts; that the Commonwealth has no jurisdiction upon the ocean within three miles of the shore; that it could not, by the statute in question, oust the United States of jurisdiction; that fishing upon the high seas is in its nature an integral part of national commerce, and its control and regulation are necessarily vested in Congress and not in the individual States; that Congress has manifested its purpose to take the regulation of coast fisheries, in the particulars covered by the Massachusetts statute in question, by the joint resolution of Congress of February 9, 1871, (16 Stat. 593,) establishing the Fish Commission, and by Title 51 of the Revised Statutes, entitled "Regulation of Fisheries," and by the act of

February 28, 1887, c. 288, (24 Stat. 434,) relating to the mackerel fisheries, and by acts relating to bounties, privileges, and agreements, and by granting the license under which the defendant's steamer was fishing; and that, in view of the act of Congress authorizing such license, no statute of a State could defeat the right of the defendant to fish in the high seas under it.

By the Public Statutes of Massachusetts, part 1, title 1, c. 1, sections 1 and 2, it is enacted as follows: "Section 1. The territorial limits of this Commonwealth extend one marine league from its seashore at low-water mark. When an inlet or arm of the sea does not exceed two marine leagues in width between its headlands, a straight line from one headland to the other is equivalent to the shore line. Section 2. The sovereignty and jurisdiction of the Commonwealth extend to all places within the boundaries thereof; subject to the rights of concurrent jurisdiction granted over places ceded to the United States." The same Public Statutes, part 1, title 1, c. 22, section 1, contain the following provision: "The boundaries of counties bordering on the sea shall extend to the line of the Commonwealth, as defined in section one of chapter one." Section 11 of the same chapter is as follows: "The jurisdiction of counties separated by waters within the jurisdiction of the Commonwealth shall be concurrent upon and over such waters." By section 2 of chapter 196 of the acts of Massachusetts of 1881, it is provided as follows: "Section 2. The harbor and land commissioners shall locate and define the courses of the boundary lines between adjacent cities and towns bordering upon the sea and upon arms of the sea from high-water mark outward to the line of the Commonwealth, as defined in said section one, [section one of chapter one of the General Statutes,] so that the same shall conform as nearly as may be to the course of the boundary lines between said adjacent cities and towns on the land; and they shall file a report of their doings with suitable plans and exhibits, showing the boundary lines of any town by them located and defined, in the registry of deeds in which deeds of real estate situated in such town are required to be recorded, and also in the office of the secretary of the Commonwealth."

The report of the Superior Court states that the point where the defendant was using the seine was within that part of Buzzard's Bay which the harbor and land commissioners, acting under the provisions of the act of 1881, had, so far as they were capable of doing so, assigned to and made part of the town of Falmouth; that the distance between the headlands at the mouth of Buzzard's Bay "was more than one and less than two marine leagues;" that "the distance across said bay, at the point where the acts of the defendant were done, is more than two marine leagues, and the opposite points are in different counties;" and that "the place where the defendant was so engaged with said seine was about, and not exceeding, one mile and a quarter from a point on the shore midway from the north line of" the town of Falmouth "to the south line" of that town.

Buzzard's Bay lies wholly within the territory of Massachusetts, having Barnstable County on the one side of it, and the counties of Bristol and Plymouth on the other. The defendant offered evidence that he was fishing for menhaden only, with a purse seine; that "the bottom of the sea was not encroached upon or disturbed;" "that it was impossible to discern objects across from one headland to the other at the mouth of Buzzard's Bay;" and that the steamer was duly enrolled and licensed at the port of Newport, Rhode Island, under the laws of the United States, for carrying on the menhaden fishery.

By section 1 of chapter 196 of the laws of Massachusetts of 1881, it was enacted as follows: "Section 1. The boundaries of cities and towns bordering upon the sea shall extend to the line of the Commonwealth as the same is defined in section one of chapter one of the General Statutes." Section 1 of chapter 1 of the General Statutes contains the provisions before recited as now contained in the Public Statutes, chapter 1, section 1, and chapter 22, sections 1 and 11. Buzzard's Bay was undoubtedly within the territory described in the charter of the Colony of New Plymouth and the Province charter. By the definitive treaty of peace of September 3, 1783, between the United States and Great Britain, (8 Stat. 81,) His

Britannic Majesty acknowledged the United States, of which Massachusetts Bay was one, to be free, sovereign and independent .States, and declared that he treated with them as such, and, for himself, his heirs and successors, relinquished all claims to the government, propriety and territorial rights of the same and every part thereof. Therefore, if Massachusetts had continued to be an independent nation, her boundaries on the sea, as defined by her statutes, would unquestionably be acknowledged by all foreign nations, and her right to control the fisheries within those boundaries would be conceded. The limits of the right of a nation to control the fisheries on its seacoasts, and in the bays and arms of the sea within its territory, have never been placed at less than a marine league from the coast on the open sea; and bays wholly within the territory of a nation, the headlands of which are not more than two marine leagues, or six geographical miles, apart, have always been regarded as a part of the territory of the nation in which they lie. Proceedings of the Halifax Commission of 1877, under the Treaty of Washington of May 8, 1871, Executive Document No. 89, 45th Congress, 2d session, Ho. Reps., pp. 120, 121, 166.

On this branch of the subject the case of *The Queen v. Keyn*, 2 Ex. D. 63, is cited for the plaintiff in error, but there the question was not as to the extent of the dominion of Great Britain over the open sea adjacent to the coast, but only as to the extent of the existing jurisdiction of the Court of Admiralty in England over offences committed on the open sea; and the decision had nothing to do with the right of control over fisheries in the open sea or in bays or arms of the sea. In all the cases cited in the opinions delivered in *The Queen v. Keyn*, wherever the question of the right of fishery is referred to, it is conceded that the control of fisheries, to the extent of at least a marine league from the shore, belongs to the nation on whose coast the fisheries are prosecuted.

In *Direct U. S. Cable Co.* v. *Anglo-American Tel. Co.*, 2 App. Cas. 394, it became necessary for the Privy Council to determine whether a point in Conception Bay, Newfoundland, more than three miles from the shore, was a part of the terri-

tory of Newfoundland, and within the jurisdiction of its legislature. The average width of the bay was about fifteen miles, and the distance between its headlands was rather more than twenty miles; but it was held that Conception Bay was a part of the territory of Newfoundland, because the British government had exercised exclusive dominion over it, with the acquiescence of other nations, and it had been declared by act of Parliament "to be part of the British territory, and part of the country made subject to the legislature of Newfoundland."

We think it must be regarded as established that, as between nations, the minimum limit of the territorial jurisdiction of a nation over tide-waters is a marine league from its coast; that bays wholly within its territory not exceeding two marine leagues in width at the mouth are within this limit; and that included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free-swimming fish, or free-moving fish, or fish attached to or embedded in the soil. The open sea within this limit is, of course, subject to the common right of navigation; and all governments, for the purpose of self-protection in time of war or for the prevention of frauds on its revenue, exercise an authority beyond this limit. Gould on Waters, part 1, c. 1, §§ 1–17, and notes; *Neill* v. *Duke of Devonshire*, 8 App. Cas. 135; *Gammell* v. *Commissioners*, 3 Macq. 419; *Mowat* v. *McFee*, 5 Sup. Ct. of Canada, 66; *The Queen* v. *Cubitt*, 22 Q. B. D. 622; St. 46 & 47 Vict. c. 22.

It is further insisted by the plaintiff in error, that the control of the fisheries of Buzzard's Bay is, by the Constitution of the United States, exclusively with the United States, and that the statute of Massachusetts is repugnant to that Constitution and to the laws of the United States.

In *Dunham* v. *Lamphere*, 3 Gray, 268, it was held, (Chief Justice Shaw delivering the opinion of the court,) that in the distribution of powers between the general and State governments, the right to the fisheries and the power to regulate the fisheries on the coasts and in the tide-waters of the State, were left, by the Constitution of the United States, with the States, subject only to such powers as Congress may justly

exercise in the regulation of commerce, foreign and domestic. In the present case the court below was asked to reconsider that decision, mainly on the ground that the admiralty and maritime jurisdiction of the courts of the United States was not considered in the opinion, and that the recent decisions of the Supreme Court of the United States, on the power of Congress to regulate commerce, required that the decision be reconsidered; but the court stated that no recent decisions of this court had been cited which related to the regulation of fisheries within the territorial tide-waters of a State, and that the decisions of this court which related to that subject did not appear to be in conflict with the decision in *Dunham* v. *Lamphere*, and that it never had been decided anywhere that the regulation of the fisheries within the territorial limits of a State was a regulation of commerce.

It is further contended that by the Constitution of the United States the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction, and is exclusive; that this case is within such jurisdiction; and that therefore, the courts of Massachusetts have no jurisdiction over it. In *McCready* v. *Virginia*, 94 U. S. 391, the question involved was, whether the State of Virginia could prohibit the citizens of other States from planting oysters in Ware River, a stream in Virginia where the tide ebbed and flowed, when her own citizens had that privilege. In that case it was said, that the principle had long been settled in this court, that each State owns the beds of all tide-waters within its jurisdiction, unless they have been granted away; and that, in like manner, the States own the tide-waters themselves and the fish in them, so far as they are capable of ownership while running; and this court added, in its opinion: " The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate its tide-waters and their beds to be used by its people as a common for taking and cultivating fish,

so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

In *Smith* v. *Maryland*, 18 How. 71, 74, a vessel licensed to be employed in the coasting trade and fisheries, was seized by the sheriff of Anne Arundel County in Maryland, while engaged in dredging for oysters in Chesapeake Bay, in violation of a statute of Maryland enacted for the purpose of preventing the destruction of oysters in the waters of that State; and the questions presented were whether that statute was repugnant to the provisions of the Constitution of the United States which grant to Congress the power to regulate commerce, or to those which declare that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction, or to those which declare that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States. Mr. Justice Curtis, in delivering the opinion of this court, said: "Whatever soil below low-water mark is the subject of exclusive property and ownership, belongs to the State on whose maritime border and within whose territory it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory, before the declaration of independence. *Pollard* v. *Hagan*, 3 How. 212; *Martin* v. *Waddell*, 16 Pet. 367; *Den* v. *The Jersey Co.*, 15 How. 426. But this soil is held by the State, not only subject to, but in some sense in trust for, the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shell-fish as floating fish." He also said that the statute of Maryland does "not touch the subject of the common liberty of taking oysters, save for the purpose of guarding it from injury, to whomsoever it may belong, and by whomsoever it may be enjoyed. Whether this liberty belongs exclusively to the citizens of the State of Maryland, or may lawfully be enjoyed

in common by all citizens of the United States; whether this public use may be restricted by the State to its own citizens or a part of them, or by force of the Constitution of the United States must remain common to all citizens of the United States; whether the national government, by a treaty or act of Congress, can grant to foreigners the right to participate therein; or what, in general, are the limits of the trust upon which the State holds this soil, or its power to define and control that trust, are matters wholly without the scope of this case, and upon which we give no opinion." Upon the question of the admiralty jurisdiction, he said : " But we consider it to have been settled by this court, in *United States* v. *Bevans,* 3 Wheat. 336, that this clause in the Constitution did not affect the jurisdiction, nor the legislative power of the States, over so much of their territory as lies below high-water mark, save that they parted with the power so to legislate as to conflict with the admiralty jurisdiction or laws of the United States. As this law conflicts neither with the admiralty jurisdiction of any court of the United States conferred by Congress, nor with any law of Congress whatever, we are of opinion it is not repugnant to this clause of the Constitution." The court also held that the act was not repugnant to the clause of the Constitution which conferred upon Congress the power to regulate commerce, and that the enrolment and license of the vessel gave to the plaintiff in error no right to violate the statute of Maryland. It is said in the opinion that " no question was made in the court below whether the place in question be within the territory of the State. The law is, in terms, limited to the waters of the State;" and the question, therefore, did not arise " whether a voyage of a vessel, licensed and enrolled for the coasting trade, had been interrupted by force of a law of a State while on the high seas, and out of the territorial jurisdiction of such State." The dimensions of Chesapeake Bay do not appear in the report of the case, but it has been said that this bay is " twelve miles across at the ocean." 1 Bish. Crim. Law, § 105. It is a bay considerably larger than Buzzard's Bay, and is not wholly within the State of Maryland, although at the point where

Anne Arundel County bounds upon it it is wholly in that State. *Haney* v. *Compton*, 7 Vroom, (36 N. J. Law,) 507; *Corfield* v. *Coryell*, 4 Wash. C. C. 371; *Weston* v. *Sampson*, 8 Cush. 347; *S. C.* 54 Am. Dec. 764; *Mahler* v. *Norwich & New York Transportation Co.*, 35 N. Y. 352; *United States* v. *Smiley*, 6 Sawyer, 640.

In the case of *Stockton* v. *Baltimore & N. Y. R. Co.*, 32 Fed. Rep. 9, in the Circuit Court for the District of New Jersey, Mr. Justice Bradley shows clearly that there is no necessary conflict between the right of the State to regulate the fisheries in a given locality and the right of the United States to regulate commerce and navigation in the same locality. He says that, prior to the Revolution, the shore and lands under water of the navigable streams and waters of the Province of New Jersey belonged to the King of Great Britain, and, after the conquest, those lands were held by the State, as they were by the King, in trust for the public uses of navigation and fishery. He adds: "It is true that to utilize the fisheries, especially those of shell-fish, it was necessary to parcel them out to particular operators. . . . The power to regulate commerce is the basis of the power to regulate navigation and navigable waters and streams. . . . So wide and extensive is the operation of this power that no State can place any obstruction in or upon any navigable waters against the will of Congress." The doctrine has always been firmly maintained by this court, that whenever a conflict arises between a State and the United States, as to the regulation of commerce or navigation, the authority of the latter is supreme and controlling.

Under the grant by the Constitution of judicial power to the United States in all cases of admiralty and maritime jurisdiction, and under the rightful legislation of Congress, personal suits on maritime contracts or for maritime torts can be maintained in the state courts; and the courts of the United States, merely by virtue of this grant of judicial power, and in the absence of legislation by Congress, have no criminal jurisdiction whatever. The criminal jurisdiction of the courts of the United States is wholly derived from the statutes of the United States. *Butler* v. *Boston & Savannah Steamship Co.*, 130 U. S.

527; *The Belfast*, 7 Wall. 624; *The Eagle*, 8 Wall. 15; *Leon
v. Galceran*, 11 Wall. 185; *Steamboat Co.* v. *Chase*, 16 Wall.
522; *S. C.* 9 R. I. 419; *Schoonmaker* v. *Gilmore*, 102 U. S.
118; *Insurance Co.* v. *Dunham*, 11 Wall. 1; *Jones* v. *United
States*, 137 U. S. 202, 211. In each of the cases of *United
States* v. *Bevans*, 3 Wheat. 336, and of *Commonwealth* v.
*Peters*, 12 Met. 387, the place where the offence was com-
mitted was in Boston Harbor; and it was held to be within,
the jurisdiction of Massachusetts, according to the meaning
of the statutes of the United States which punished certain
offences committed upon the high seas or in any river, haven,
basin or bay " out of the jurisdiction of any particular State."
The test applied in *Commonwealth* v. *Peters*, which was de-
cided in the year 1847, was that the place was within a bay
" not so wide but that persons and objects on the one side can
be discerned by the naked eye by persons on the opposite side,"
and was therefore within the body of a county. In *United
States* v. *Bevans*, Marshall, C. J., said: " The jurisdiction of a
State is coextensive with its territory; coextensive with its
legislative power. The place described is unquestionably
within the original territory of Massachusetts. It is then
within the jurisdiction of Massachusetts, unless that jurisdic-
tion has been ceded to the United States." If the place
where the offence charged in this case was committed is with-
in the general jurisdiction of Massachusetts, then, according to
the principles declared in *Smith* v. *Maryland*, the statute in
question is not repugnant to the Constitution and laws of the
United States.

It is also contended that the jurisdiction of a State as· be-
tween it and the United States must be confined to the body
of counties; that counties must be defined according to the
customary·English usage at the time of the adoption of the
Constitution of the United States; that by this usage counties
were bounded by the margin of the open sea; and that, as to
bays and arms of the sea extending into the land, only such
or such parts were included in counties as were so narrow that
objects could be distinctly seen·from one shore to the other by
the naked eye. But there is no indication that the customary

law of England in regard to the boundaries of counties was adopted by the Constitution of the United States as a measure to determine the territorial jurisdiction of the States. The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the State. In *United States* v. *Bevans*, Marshall, C. J., in the opinion, asks the following questions: "Can the cession of all cases of admiralty and maritime jurisdiction be construed into a cession of the waters on which those cases may arise?" "As the powers of the respective governments now stand, if two citizens of Massachusetts step into shallow water when the tide flows, and fight a duel, are they not within the jurisdiction, and punishable by the laws, of Massachusetts?" The statutes of the United States define and punish but few offences on the high seas, and, unless other offences when committed in the sea near the coast can be punished by the States, there is a large immunity from punishment for acts which ought to be punishable as criminal. Within what are generally recognized as the territorial limits of States by the law of nations, a State can define its boundaries on the sea and the boundaries of its counties; and by this test the Commonwealth of Massachusetts can include Buzzard's Bay within the limits of its counties.

The statutes of Massachusetts, in regard to bays at least, make definite boundaries which, before the passage of the statutes, were somewhat indefinite; and Rhode Island and some other States have passed similar statutes defining their boundaries. Public Statutes of Rhode Island, 1882, c. 1, §§ 1, 2; c. 3, § 6 ; Gould on Waters, § 16 and note. The waters of Buzzard's Bay are, of course, navigable waters of the United States, and the jurisdiction of Massachusetts over them is necessarily limited, *Commonwealth* v. *King*, 150 Mass. 221; but there is no occasion to consider the power of the United States to regulate or control, either by treaty or legislation, the fisheries in these waters, because there are no existing treaties or acts of Congress which relate to the menhaden fish-

eries within such a bay. The rights granted to British subjects by the treaties of June 5, 1854, and May 8, 1871, to take fish upon the shores of the United States, had expired before the statute of Massachusetts (St. 1886, c. 192) was passed which the defendant is charged with violating. The Fish Commission was instituted "for the protection and preservation of the food fishes of the coast of the United States." Title 51 of the Revised Statutes relates solely to food fisheries, and so does the act of 1887. Nor are we referred to any decision which holds that the other acts of Congress alluded to apply to fisheries for menhaden, which is found as a fact in this case not to be a food fish, and to be only valuable for the purpose of bait and of manufacture into fish oil.

The statute of Massachusetts which the defendant is charged with violating is, in terms, confined to waters "within the jurisdiction of this Commonwealth;" and it was evidently passed for the preservation of the fish, and makes no discrimination in favor of citizens of Massachusetts and against citizens of other States. If there be a liberty of fishing for swimming fish in the navigable waters of the United States common to the inhabitants or the citizens of the United States, upon which we express no opinion, the statute may well be considered as an impartial and reasonable regulation of this liberty; and the subject is one which a State may well be permitted to regulate within its territory, in the absence of any regulation by the United States. The preservation of fish, even although they are not used as food for human beings, but as food for other fish which are so used, is for the common benefit; and we are of opinion that the statute is not repugnant to the Constitution and the laws of the United States.

It may be observed, that § 4398 of the Revised Statutes, (a reënactment of § 4 of the joint resolution of February 9, 1871,) provides as follows, in regard to the Commissioner of Fish and Fisheries: "The commissioner may take or cause to be taken at all times, in the waters of the seacoast of the United States, where the tide ebbs and flows, and also in the waters of the lakes, such fish or specimens thereof as may in his judgment, from time to time, be needful or proper for the

conduct of his duties, any law, custom, or usage of any State to the contrary notwithstanding." This enactment may not improperly be construed as suggesting that, as against the law of a State, the Fish Commissioner might not otherwise have the right to take fish in places covered by the state law.

The pertinent observation may be made that, as Congress does not assert, by legislation, a right to control pilots in the bays, inlets, rivers, harbors, and ports of the United States, but leaves the regulation of that matter to the States, *Cooley* v. *Board of Wardens*, 12 How. 299, so, if it does not assert by affirmative legislation its right or will to assume the control of menhaden fisheries in such bays, the right to control such fisheries must remain with the State which contains such bays.

We do not consider the question whether or not Congress would have the right to control the menhaden fisheries which the statute of Massachusetts assumes to control; but we mean to say only that, as the right of control exists in the State in the absence of the affirmative action of Congress taking such control, the fact that Congress has never assumed the control of such fisheries is persuasive evidence that the right to control them still remains in the State.

*Judgment affirmed.*