UNITED STATES v. SAMPLES. SAME v. DE LAPP. STATE OF
MISSOURI v. HOLLAND, United States Game Warden.

(District Court, W. D. Missouri. July 2, 1919.)

1. STATES ⚖4—TREATIES AND LAWS—WILD ANIMALS.
   Primarily the state, both as trustee for the rights of its people and in
   the exercise of its police power, has control over the right to reduce ani-
   mals feræ naturæ to possession, and the federal government, in absence of
   treaty, has no paramount authority therein.

2. TREATIES ⚖11—OPERATION IN STATES.
   The treaty making power is one of the highest degree, delegated by the
   states to the federal government by the terms of the Constitution, and
   is superior to state Constitutions, state laws, and all other state powers, in-
   cluding police powers, but the subject-matter must not be arbitrary, dis-
   connected, and remote from international intercourse.

3. TREATIES ⚖1—DEFINITION.
   A treaty is a compact between two or more independent nations, with
   a view to the public welfare, or entered into for the common advancement
   of their interests and the interests of civilization.
   [Ed. Note.—For other definitions, see Words and Phrases, First and
   Second Series, Treaty.]

4. CONSTITUTIONAL LAW ⚖45—CONSTITUTIONALITY OF TREATY—POWER OF
   COURT TO DECLARE INVALID.
   If a treaty is invalid because in violation of, or inconsistent with the
   Constitution, the court, in a proper case where the rights of citizens are
   involved, may so declare.

5. GAME ⚖4—TREATIES ⚖2—VALIDITY—PROTECTING MIGRATORY BIRDS—
   VALIDITY OF STATUTES.
   The protection of migratory birds is properly the subject of negotiation
   between the United States and Great Britain and the treaty of December
   8, 1916, is valid, and Act July 3, 1918 (Comp. St. 1918, Append. §§ 8837a–
   8837m), enacted to give effect to the treaty, is constitutional and valid.

6. UNITED STATES ⚖125—CONSENT TO BE SUED.
   The United States cannot be sued without its consent.

George L. Samples and W. C. De Lapp were separately indicted
on charge of having violated Act Cong. July 3, 1918, relating to
hunting and killing migratory birds, and they demur to the indictments
on the ground that the act is unconstitutional and void, and after the
return of the indictments the State of Missouri, through its Attorney
General filed its bill in equity, seeking to restrain Ray P. Holland,
Game Warden of the United States, from enforcing such act within
the state, and the respondent through the United States District At-
torney moved to dismiss this bill, and the demurrers and motion were
heard together. Demurrers overruled, and bill dismissed.

Frank W. McAllister, Atty. Gen., John T. Gose, Asst. Atty. Gen.,
J. G. L. Harvey, of Kansas City, Mo., E. L. Westbrooke, of Jonesboro,
Ark., and Samuel W. Moore, of Kansas City, Mo., for defendants and
complainant.

Francis M. Wilson, U. S. Dist. Atty., of Kansas City, Mo., for plain-
tiffs and respondent.

VAN VALKENBURGH, District Judge. December 8, 1916, a
treaty between Great Britain and the United States for the protection

of migratory birds was proclaimed by the President (39 Stat. 1702). Thereafter, to give effect to this convention, Congress enacted a law, approved July 3, 1918 (United States Statutes at Large, vol. 40, pt. 1, c. 128, pp. 755–757 [Comp. St. 1918, Append. §§ 8837a–8837m]). This act, among other things, provided that it should be unlawful to hunt, take, capture, or kill, attempt to take, capture, or kill, etc., at any time or in any manner, any migratory bird included in the terms of said convention between the United States and Great Britain, unless and except as permitted by regulations made as therein provided by the Secretary of Agriculture. Thereafter such regulations were made, and duly proclaimed by the President, wherein the open seasons for hunting such birds in all parts of the United States were defined. Canada by an act of Parliament, approved August 29, 1917, gave full effect to said convention and promulgated regulations thereunder May 11, 1918.

The defendants Samples and De Lapp were indicted upon the charge of having violated said act of Congress, passed to give effect to the treaty aforesaid, and the regulations made thereunder, it being provided in said act that such violation shall be deemed a misdemeanor, carrying a penalty of fine or imprisonment or both. The defendants have interposed to these indictments demurrers containing several specifications, the gist of which is that the act in question is unconstitutional and void, because the subject-matter thereof is exclusively within the property rights and police powers of the state; because no provision can be found in the federal Constitution for the protection of migratory birds; and because the convention between the United States and Great Britain exceeds the limitations of the treaty making powers under the Constitution, and is therefore in violation of the Constitution itself.

After the return of these indictments the state of Missouri, through its Attorney General, filed its bill in equity, seeking to restrain the Game Warden of the United States, in this jurisdiction, from arresting or prosecuting, or attempting to arrest and prosecute, any person for taking, killing, or using wild game within the borders of the state of Missouri, and from in any wise enforcing or attempting to enforce the aforesaid act of Congress known as the Migratory Bird Treaty Act, or any regulations or orders of the Secretary of Agriculture of the United States made or pretended to be made thereunder; and from in any wise interfering with the exercise of the rights and privileges granted by complainant to its citizens in the assumed exercise of its sovereign and reserved power. The respondent, through the United States District Attorney, filed his motion to dismiss this bill. Both demurrers and motion were heard together; the former will be first considered.

The issues tendered by the pleadings present two questions: One, the validity of the law standing by itself as affecting the relative powers of the federal government and of the states; the other, the status of the treaty, to give effect to which the so-called Migratory Bird Treaty Act was passed.

[1] Primarily the state, both as trustee for the rights of all its people and in the exercise of its police power, has control over the right to reduce animals feræ naturæ to possession. Manchester v. Mass., 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159; The Abby Dodge, 223 U. S. 166–174, 32 Sup. Ct. 310, 56 L. Ed. 390; Geer v. Conn., 161 U. S. 519, 522, 528, 16 Sup. Ct. 600, 40 L. Ed. 793; Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244; Patsone v. Penn., 232 U. S. 138, 34 Sup. Ct. 281, 58 L. Ed. 539; United States v. McCullagh (D. C.) 221 Fed. 288; United States v. Shauver (D. C.) 214 Fed. 154; Silz v. Hesterberg, 211 U. S. 31, 29 Sup. Ct. 10, 53 L. Ed. 75; Kennedy v. Becker, 241 U. S. 556, 36 Sup. Ct. 705, 60 L. Ed. 1166; State v. Rodman, 58 Minn. 393, 59 N. W. 1098; Smith v. Maryland, 18 How. 71–75, 15 L. Ed. 269; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; Carey v. South Dakota, Supreme Court, No. 346, May Term, 1919, 250 U. S. 118, 39 Sup. Ct. 403, 63 L. Ed. ——. And in the absence of treaty there appears to have been no delegation of paramount authority to the federal government. Under the foregoing authorities, therefore, as well as on principle, this act, in the absence of treaty, would be unconstitutional, as exceeding the legitimate powers of Congress; and so it has been held in cases substantially identical. United States v. Shauver (D. C.) 214 Fed. 154; United States v. McCullagh (D. C.) 221 Fed. 288. That this power in the state is subject to any valid exercise of authority under the provisions of the federal Constitution is clear; and that a valid exercise of the treaty making power may be recognized as such a valid exercise of authority has been foreshadowed by necessary implication or by express reservation in the decisions of the Supreme Court of the United States. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; Manchester v. Mass., 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159; The Abby Dodge v. United States, 223 U. S. 166–174, 32 Sup. Ct. 310, 56 L. Ed. 390; Geer v. Conn., 161 U. S. 519, 522, 528, 16 Sup. Ct. 600, 40 L. Ed. 793; Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244; Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; Kennedy v. Becker, 241 U. S. 556, 36 Sup. Ct. 705, 60 L. Ed. 1166; Smith v. Maryland, 18 How. 71–75, 15 L. Ed. 269; United States v. Forty-Three Gallons of Whisky, 93 U. S. 188–197, 23 L. Ed. 846; Carey v. South Dakota, Supreme Court, No. 346, May Term, 1919, 250 U. S. 118, 39 Sup. Ct. 403, 63 L. Ed. ——. See, also, opinion of Attorney General Griggs, Treaties—Fisheries, 22 Op. Attys. Gen. 214.

[2] That the power to make treaties is a substantial power of highest degree, delegated by the states to the federal government by the terms of the Constitution, is beyond controversy. The treaty making power has been surrendered by the states and given to the United States. Baldwin v. Franks, 120 U. S. 678–782, 7 Sup. Ct. 656, 32 L. Ed. 766; Fong Yue Ting v. United States, 149 U. S. 711, 13 Sup. Ct. 1016, 37 L. Ed. 905; Chinese Exclusion Cases, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068. And this extends to state Constitutions and laws as well as to the reserved powers. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; Hoke v. United States, 227 U. S. 321–322, 33 Sup.

Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905.

Mr. John C. Calhoun, foremost among those insisting upon the fullest sovereign powers of the states, while Secretary of State, made this statement in an official document:

"The treaty making power has indeed been regarded to be so comprehensive as to embrace, with few exceptions, all questions that can possibly arise between us and other nations and which can only be adjusted by their mutual consent, whether the subject-matter be comprised among the delegated or the reserved powers." Crandall on Treaties (2d Ed.) par. 105, p. 247.

Where, then, any power has been granted to the federal government by the Constitution, to be exercised through legislation by Congress, or as an incident of the legitimate treaty making power, it is superior to state Constitutions and state laws, and to all other powers, including police powers, ordinarily belonging to the states. All such must be modified, curtailed, or, in a proper case, suspended, to insure the full and complete exercise of that superior power which has been delegated by the Constitution to the central government.

"While under our Constitution and form of government the great mass of local matters is controlled by local authorities, the United States, in their relation to foreign countries and their subjects or citizens are one nation, invested with powers which belong to independent nations, the exercise of which can be invoked for the maintenance of its absolute independence and security throughout its entire territory." Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068.

It must be remembered that we are here considering the power of the federal government in its relation to the several states. In such case, it is necessary only that the grant of power to the former and its legitimate exercise shall be established. Thereupon all elements of state sovereignty, however reserved, become at once subordinate. No other construction is possible if the Constitution is to be vindicated as the supreme law of the land. Undoubtedly, we may conceive of many rights of the states over which the federal government through its power to make treaties can have no control. A number of such are stated in Pierce v. State, 13 N. H. 576. The subject-matter of negotiation must be one which falls naturally and logically into recognized classification. It must not be arbitrary, disconnected, and remote from international intercourse.

[3, 4] The validity of this act then depends upon whether this treaty was a valid exercise of federal authority as delegated by the Constitution. A treaty is a compact between two or more independent nations with a view to the public welfare. It is a compact made between two or more nations, entered into for the common advancement of their interests and the interests of civilization. Michie's Ency. of U. S. Sup. Ct. Rep., vol. 11, p. 636; Altman & Co. v. United States, 224 U. S. 583, 32 Sup. Ct. 593, 56 L. Ed. 894; 14 Diamond Rings v. United States, 183 U. S. 176–182, 22 Sup. Ct. 59, 46 L. Ed. 138.

A treaty is invalid if in violation of or inconsistent with the Constitution. Butler on Treaties, vol. 2, par. 455, p. 350; Crandall on

Treaties (2d Ed.) p. 268; Federal Statutes Annotated, vol. 9, p. 28; Cherokee Tobacco Case, 11 Wall. 620, 20 L. Ed. 227; United States v. Old Settlers, 148 U. S. 427, 13 Sup. Ct. 650, 37 L. Ed. 509; Fong Yue Ting v. United States, 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905; Ex parte Dos Santos, Fed. Cas. No. 4,016, 7 Fed. Cas. 949; Geofroy v. Riggs, 133 U. S. 266, 10 Sup. Ct. 295, 33 L. Ed. 642.

And this being true, the court, in a proper case where the rights of citizens are involved, may so declare. Michie's Encyc. of U. S. Sup. Ct. Rep., vol. 11, p. 640; Head Money Cases, 112 U. S. 580–598, 5 Sup. Ct. 247, 28 L. Ed. 798; In re Cooper, 143 U. S. 473, 501, 503, 12 Sup. Ct. 453, 36 L. Ed. 232; Jones v. Meehan, 175 U. S. 32, 29 Sup. Ct. 1, 44 L. Ed. 49.

The general rule as to limitations upon the treaty making power is most comprehensively stated in Geofroy v. Riggs, 133 U. S. 266, 10 Sup. Ct. 295, 33 L. Ed. 642. If this pronouncement, in any view, could properly be regarded as obiter, nevertheless it has been so frequently and approvingly restated that it must now be regarded as the settled rule in the courts of this country.

"The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the states. It would not be contended that it extends so far as to authorize what the Constitution forbids or a change in the character of the government or in that of one of the states, or a cession of any portion of the territory of the latter, without its consent. * * * But with these exceptions, * * * there is no limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country." Geofroy v. Riggs, 133 U. S. 266, 10 Sup. Ct. 297, 33 L. Ed. 642.

As has been frequently stated, "An attempt to enumerate these limitations in more specific terms than here used by Mr. Justice Field would be idle." It is sufficiently comprehensive to include all acts by the treaty making power which might seek or tend to impair or destroy the constitutional functions exclusively conferred upon this government and its several departments.

[5] Is the protection of migratory birds then "properly the subject of negotiation with a foreign country"? In the opinion of a former Attorney General the United States is given power to enter into treaty stipulations with Great Britain for the regulation of the fisheries in the waters of the United States and Canada along the international boundary; and such is now the accepted view. This is because "the nature and habits of fishes, the means necessary to their preservation from extinction, and their protection in spawning time are such as to render it of importance that laws regulating their capture shall be uniform and uniformly enforced over the whole extent of the body of water which they inhabit. Where a lake or river is divided into two jurisdictions by a boundary line between two nations, it is manifest that it would be not only convenient, but almost necessary, for the adequate regulation of the subject that an agreement by treaty or other stipulation should exist between the governments of the two countries, in order to make any system of regulation and protection

effective." Otherwise "it is impossible of regulation by uniform and-, reciprocal rules." Mutuality and the attainment of reciprocal benefits are distinctive features of international conventions. Of course, such must be tangible and proximate. The subject-matter must be of the nature of those that have usually been made the subject of negotiation and treaty in the ordinary intercourse of nations, provided, always, that they are consistent with the nature of our institutions. It is, of course, unnecessary that the precise subject shall have been previously under consideration. This would mean that nations have exhausted the subject-matter of their intercourse, and can no longer extend their avenues of mutual advantage. But, as above stated, the matter of negotiation must be one which falls naturally and logically into recognized classification. It must not be arbitrary, disconnected, and remote from international intercourse.

The case of free-swimming fishes in international waters is one which appeals more readily to the common understanding, because there international contact is apparent. But does the case of migratory birds differ in principle from that of migratory fishes or other similar forms of wild life? The term "migrate" as used in this connection is thus defined:

"To pass periodically from one region or climate to another for feeding or breeding. * * * The majority of birds of the north temperate and arctic regions perform regular migrations, which are dependent on food supply more than on temperature, moving north in the spring and south in the fall."

Seals go regularly to their breeding and feeding grounds. Fishes migrate during the spawning season. Migratory birds nest in the north and feed in the south with the regularity of the seasons. The movements of all these forms of life may be computed almost with mathematical precision. Their courses through the water and through the air are almost as well defined as though marked by Old Trails' monuments. Their movements are dictated by neither whim nor caprice, but are impelled by an instinct which inheres in the law of their being. If this be true, what distinction can we draw between the fish which swims through one of the great natural elements and the bird which flies through another? The controlling consideration is the effect upon the mutual interests of the two nations concerned. By this treaty the United States profits by the protection which is accorded such wild fowl in Canada during the nesting and feeding seasons before the migration sets in to the south. Canada gains by the same protection which is thrown about the same birds during their stay within the United States. The people of both countries, of our entire Union and of all the states, benefit by the mutual and reciprocal advantages which accrue from this arrangement. If this be so, then the subject-matter comes properly within the treaty making power. If it curtails any right which would otherwise be lodged in an individual state, it does so only through the full and untrammeled exercise of a federal power to negotiate with a foreign government. The conflict of jurisdiction, if one can be said to exist, differs in no respect from that which is experienced in the exercise of any power concededly lodged in the federal government which comes in con-

tact with the ordinary powers of the state over the same subject-matter.

From the foregoing, it follows necessarily that the demurrers to the indictments must be overruled.

[6] With respect to the bill filed on behalf of the state of Missouri but little remains to be said. It is based upon the same misconception as to the constitutionality of this statute that lies at the foundation of the demurrers. The District Attorney insists that the bill should be dismissed for want of jurisdiction. It is true that the United States cannot be sued without its consent, and that, in general, courts of equity are without jurisdiction to restrain criminal proceedings. It would seem, however, that a United States officer, as well as a state officer, under certain circumstances may be restrained from instituting criminal proceedings under an unconstitutional law in accordance with exceptions to the general rule as pointed out in decisions of the Supreme Court. However, it is unnecessary to enter upon any extended discussion of this question. In my view, the law is constitutional, and the United States Game Warden has acted, and is about to act, under lawful authority in the discharge of his official duties. From such acts he cannot, and should not, be restrained by this court. Inasmuch as the bill of complainant is founded solely upon the unconstitutionality of the law and the alleged invasion of a sovereign prerogative of the state, it follows that the relief prayed must be denied, and that the bill must be dismissed. It is so ordered.