Dawn Howell HOOKER et al., Plaintiffs,

v.

RAYTHEON COMPANY et al., Defendants.

Petition of Richard DOWSE et al., Petitioners.

Nos. 235-61, 495-61.

United States District Court
S. D. California,
Central Division.

Dec. 27, 1962.

---

26. See Footnote 4 supra.

See also 31 F.R.D. 120.

Lillick, Geary, McHose, Roethke & Myers, by Lawrence D. Bradley, Jr., and David Brice Toy, Los Angeles, Cal., for petitioners and for defendants Constance E. McCaffrey, Richard Dowse, and McCaffrey Bros. Sporting Goods.

Richard McLeod, Los Angeles, Cal., for plaintiffs.

Moss, Lyon & Dunn, Los Angeles, Cal., for cross-complainant Raytheon Co.

Wright, Wright, Goldwater & Mack, Los Angeles, Cal., for Betty Lou Mackey, Marian H. Terres, Helen T. Russell and Liberty Mut. Ins. Co.

CRARY, District Judge.

The parties to the within actions have stipulated that the vessel "Marie" was lost with all hands and that the death of Loren Dale Howell, Paul Timothy Lovette, and all other persons who were on the ill-fated craft occurred in the waters of Santa Barbara channel more than one marine league (three nautical miles) from either the mainland or closest channel island. The Santa Barbara channel lies between Santa Barbara, California, and the Santa Barbara Islands. The question now posed is—were the deaths within the purview of the United States statute known as Death on the High Seas by Wrongful Act, Title 46 U.S.C. §§ 761–768, enacted March 30, 1920, and hereafter referred to as Death on the High Seas Act.

The said vessel "Marie" was wood-hulled, of 13.9 gross tons, 40.1 feet registered length and powered by one General Motors marine engine of 225 horsepower.

On or about June 7, 1960, at 7:30 a. m., the "Marie" departed her berth in Santa Barbara, California, for the general area of the Santa Barbara Islands and was never seen thereafter. It is agreed by the parties that she was, at the time, transporting certain instruments to be lowered into ocean waters for the purpose of conducting underwater tests.

About 6:30 p. m., June 9, 1960, the body of Paul Timothy Lovette was recovered from ocean waters in approximately mid-Santa Barbara channel. The bodies of Loren Dale Howell and two other persons aboard the "Marie" when she was lost were thereafter recovered at various points in the ocean waters off Southern California or on its shores. The court has found that the "Marie" was lost and the deaths occurred on or about June 9, 1960.

It is the contention of Plaintiffs that the vessel "Marie" was lost as a result of the wrongful act, neglect or default of defendants, Raytheon Company, Hugh James McCaffrey, deceased, and Richard Dowse, doing business as McCaffrey

Brothers Sporting Goods. Defendants assert the "Marie" was lost as a result of an inevitable and unavoidable accident. The Santa Barbara channel is approximately twenty miles wide off the City of Santa Barbara in a north-south direction. It is approximately twelve miles wide at the southeast end of the channel, off Anacapa Islands, and is about thirty miles wide at its widest point between the mainland and Santa Rosa Island. The Santa Barbara Islands are a part of the County of Santa Barbara. (Government Code, § 23142.)

The petitioners in case No. 495–61–EC seek limitation of or exoneration from liability. Limitation is sought under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 181 et seq., with particular reference to Sections 183 and 186.

Section 761 of Chapter 21, Title 46 U.S.C., entitled Death on the High Seas by Wrongful Act, provides in pertinent part,

> "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, * *, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

Section 767 of said Title provides,

> "The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone."

In considering whether the Santa Barbara channel, between a marine league (3.45 statute miles) off the coast of California and a marine league off the shores of the Islands of the Santa Barbara group, is high seas or territorial waters of the State of California, we find that Article XXI of the Constitution of the State of California, as adopted in the year 1849, sets forth in detail the boundaries of the State of California, and with respect to the boundary line along the Pacific Coast states that it extends therein "three English miles; thence running in a northwesterly direction and following the direction of the Pacific Coast to the forty-second degree of north latitude; thence on the line of said forty-second degree of north latitude to the place of beginning. Also, including all the islands, harbors, and bays along and adjacent to the coast."

In 1949, by legislative action codified in Section 170 of the Government Code of California, it is provided, with respect to the seaward boundaries of the State of California, as follows:

> "To give greater precision to the boundary of the State of California as defined in Article XXI of the Constitution, it is hereby declared that the part of the boundary which is described as 'running in a northwesterly direction and following the direction of the Pacific Coast to the forty-second degree of north latitude,' and as 'including all the islands, harbors, and bays along and adjacent to the coast,' runs and has in the past run three English nautical miles oceanward of lines drawn along the outer sides of the outermost of the islands, reefs and rocks along and adjacent to the mainland and across intervening waters; and where there are harbors, but no such outlying islands, reefs and rocks, it runs and in the past has run three English nautical miles oceanward of lines drawn in front of the harbors along the outermost works and installations thereof, and, in the case of all bays (including inlets and estuaries) three English nautical miles from lines drawn from headland to headland across the mouth of each

bay, inlet and estuary, regardless of the length of the lines. * * * "

It is noted that the California Legislature in 1949 determined that the seaward boundary of the State of California *has always been, since the adopting of the Constitution in 1849,* as defined by Section 170 of the Government Code of California, supra. The provisions of this law clearly places all of the ocean area of the Santa Barbara channel within the boundaries of the State of California. Thus, the Legislature of California has determined its boundaries to include waters of the channel more than three miles from either the mainland or the Santa Barbara Islands. Having in mind the above provisions of the California Constitution and legislative interpretation thereof, we return to the question of what effect, if any, is the Death on the High Seas Act in the area of Santa Barbara channel outside of a marine league from either the mainland or any of the islands involved.

The California courts have considered the matter of state jurisdiction for police purposes over bays and harbors which indent the coast of California. Rex, Inc., v. Superior Court, 34 Cal.App.2d 96, 93 P. 2d 182 (1939), and People v. Stralla, 14 Cal.2d 617, 96 P.2d 941 (1939), concerned the determination of the boundaries of Santa Monica Bay. After holding that the seaward boundary of the Bay was determined by a line between its adjoining headlands, the court, in the Stralla case, said at page 633, 96 P.2d at page 948,

"It follows that the jurisdiction of the state extends over the waters of Santa Monica Bay landward from a line drawn between its headlands, Point Vincente and Point Dume, and at least for a distance of three miles oceanward from that line, and that such jurisdiction may be exercised by the state for all proper purposes including the prosecution of violators of the penal laws of the state."

The court in In re Humboldt Lumber Manufacturers' Association, 60 F. 428, D.C.N.D.Cal. (1894), affirmed 73 F. 239 (9th Cir., 1896), held that the California wrongful death act applied to deaths occurring less than three miles from the shore and in effect ruled that the act had no effect beyond that limit. Section 170 of the Government Code of California is not discussed in the opinion but the court states (60 F. page 432) that the Constitution and Political Code of California fixed the Western boundary of the State on the Pacific Ocean three miles west of the shoreline.

The United States Supreme Court in United States v. California, 332 U.S. 19 (1946), says at page 36 of its opinion, 67 S.Ct. 1658, at page 1667, 91 L.Ed. 1889,

"Conceding that the state has been authorized to exercise local police power functions in the part of the marginal belt within its declared boundaries, these do not detract from the Federal Government's paramount rights in and power over this area."

The California case, supra, dealt with oil rights on the territorial shelf and is not directly in point in the case at bar but would indicate that the state may be estopped from claiming powers over any waters more than three miles from the nearest shore of its territory.

The District Court of Appeal of the State of California in Ex parte Marincovich, 48 Cal.App. 474, 192 P. 156 (1920), was concerned with the determination of whether the ocean area included in Fish and Game District No. 20 around Santa Catalina Island was "state waters" for enforcement of the then Penal Code, Section 636 (Fish and Game). At pages 477–478 of its opinion, at page 157 of 192 p., the court states,

"If the extent of California's jurisdiction is to be determined according to the general rule, based upon usage uniformly recognized by the law of nations, there can be no doubt that it includes a zone of water, three miles wide, around Catalina Island. [2] All the writ-

ers upon public law agree that every nation has exclusive jurisdiction over the waters adjacent to its shores to a distance of three miles from shore, or, as it is frequently expressed, 'the distance of a cannon shot from shore.' The distance of three geographical miles was fixed at a time when no gun could force a ball farther. This rule of international usage is applicable to California just as though it were an independent, sovereign nation, save only that its right of exclusive control over such waters is limited in so far as control may have been granted to the United States. Manchester v. Massachusetts, 139 U.S. 234, 11 S.Ct. 559, 35 L.Ed. 159 [see, also, Rose's U.S. Notes]; Humboldt L. M. Ass'n v. Christopherson, 73 Fed. 239, 19 C.C.A. 481, 46 L.R.A. 264. * * *

"There is just as much reason for the extension of state sovereignty over a three-mile belt around Catalina Island as there is for the extension of sovereignty over a 3-mile zone along and off the shore of the mainland. * * * That a state's sovereignty extends over a 3-mile belt around islands that lie along and adjacent to its shores was evidently the opinion of Secretary Bayard, who, in 1886, wrote to Mr. Manning, the then Secretary of the Treasury, as follows: 'We may therefore regard it as settled * * * that, so far as concerns the eastern coast of North America, the position of this department has uniformly been that the sovereignty of the shore does not, so far as territorial authority is concerned, extend beyond 3 miles from low-water mark, and that the seaward boundaries of this zone of territorial waters follows the coast of the mainland, *extending where there are islands so as to place around such islands the same belt.'* (Italics ours.) See 1 Wharton's Dig.Int. Law, § 32. We conclude, therefore, that, unless the people of the state, in their definition of the state's boundary as set forth in article 21 of the Constitution, have deliberately excluded such waters from the territory over which the state's sovereignty extends, the state has jurisdiction over a belt of water, three miles wide, around each of the islands that lie along and adjacent to our shores."

The case of Wilmington Transportation Company v. Railroad Commission of California, 236 U.S. 151, 35 S.Ct. 276, 59 L.Ed. 508 (1915), was heard by the Supreme Court of the United States on certiorari. At page 509, the report states:

"In error to the Supreme Court of the State of California to review a judgment which, on certiorari, sustained the authority of the State Railroad Commission to prescribe reasonable rates for carriage by water between two ports in the state over a course traversing the high seas. Affirmed.

"See same case below, 166 Cal. 741, 137 P. 1153."

The two ports involved were San Pedro, California, and Avalon, Santa Catalina Island, which island is a part of Los Angeles County, California. At page 515, the court observes,

"The vessels of the plaintiff in error, in their direct passage between the ports named, must traverse the *high seas* for upwards of 20 miles. * * * While a portion of the voyage is on the high seas, the navigation thereof is merely incidental to the real purpose of the voyage, which is to ply between two ports, both of which are located in the same county in this state." (Emphasis ours.)

Thus, we find the United States Supreme Court in 1915 ruling that the waters of the Santa Catalina channel are "high seas."

In Gordon v. Reynolds, 187 Cal.App.2d 472, 10 Cal.Rptr. 73 (1960), the California District Court of Appeals held that the California Wrongful Death Act did not apply to a death resulting from a plane crash occurring some seven miles

692

off the Big Sur coast south of Monterey, California, the court there holding that the said California Act extended only three miles from the shoreline. It is to be noted, however, that no channel between the mainland and off-shore islands was involved.

The California case of In re Marincovich, supra, is followed by the Supreme Court of Maine in State v. Ruvido, 137 Me. 102, 15 A.2d 293 (1940), which concerned the fishing rights of a resident of Massachusetts in waters within the three-mile belt off Seal Island, a part of the State of Maine. A Maine statute asserted control of fishing rights in waters within a three-marine-mile belt around the said Island. In giving judgment for the State of Maine, the court says, at page 295 of the opinion,

"Grotius laid down the doctrine that territorial rights extended over as much of the sea as could be defended from the shore. Grotius, The Law of War and Peace, Book II, Chap. 3, Secs. 13–14. * * * In spite of the lengthening range of artillery this has remained the test generally applied to the present day.

"[6] Our shore in the State of Maine is fringed with thousands of islands, many of which are large and the homes of varied industries, others so wild and inaccessible that they seldom feel the tread of human feet. All are, however, an integral part of our state and to a greater or less extent, as bulwarks against the sea, form our harbors and the calm reaches through which commerce flows up and down our shore. It is, therefore, important for us to know that in determining the extent of our control over the water, these islands are regarded as natural appendages of the mainland and as a part of our coast as that word is used in the books. Wheaton, Elements of International Law (Edited by George Grafton Wilson 1936, Part II, Sec. 178); The Anna, 5 C.Rob.Adm.Rep. 385. See In re Marincovich, 48 Cal. App. 474, 192 P. 156, which holds

that the sovereignty of the State of California extends for a distance of three miles around Catalina Island, which is twenty-one miles from the mainland."

At page 297 of its opinion, the Maine court says,

"The case now before us cannot be distinguished from In re Marincovich, supra. The doctrine there laid down is in accord with well-settled principles. We therefore hold that the act complained of did take place within the territorial waters of this state over which it has jurisdiction and sovereignty.

"The other contentions of the respondent need but passing comment.

"[9, 10] He complains because he says this state has not by statute, as has Massachusetts, defined its territorial limits on the coastal waters. Such a statute, however, would be only declaratory of the law. A man cannot 'add one cubit unto his stature,' and the legislature by its act cannot extend the jurisdiction of the state beyond the limits generally recognized by law." (Emphasis ours.)

In Guess v. Read, 5 Cir., 290 F.2d 622 (1961), the question of the application of the laws of Louisiana to an action for wrongful death resulting from the fall of a helicopter going from an oil derrick in the Gulf of Mexico to shore. The fall was more than three miles seaward from the shore but on the continental shelf. Plaintiff relied on the Louisiana Direct Action Statute, which applies to accident or injury occurring within the State of Louisiana, and on the provisions of the Outer Continental Shelf Lands Act, which provides, in part,

"To the extent that they are applicable and not inconsistent with this Act * * * civil and criminal laws of each adjacent State as of the effective date of this Act are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental

Shelf, * * *." See page 624 of the opinion.

The court held that the death occurred outside of the State of Louisiana and that the Death on the High Seas Act applied. With respect to the effect of the Continental Shelf Act, the court states, at page 625 of its opinion, that this Act was enacted primarily for the purpose of asserting ownership of and jurisdiction over "the subsoil and seabed" and "this does not include the sea above the subsoil and seabed and does not include the air above the sea."

Holding that Florida had authority to legislate reuse of commercial diving equipment in taking sponges from waters off the coast of Florida and beyond the three-mile limit, the United States Supreme Court, in Skiriotes v. Florida, 313 U.S. 69 (1941), at page 77, 61 S.Ct. 924, at page 929, 85 L.Ed. 1193 states:

"If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress."

Several of the cases discussed hereinabove cite Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159, wherein it was held that Buzzards Bay was within the limits of the counties of Massachusetts. At page 258, 11 S.Ct. at page 562, the United States Supreme Court observes,

"*We think it must be regarded as established that, as between nations,* the minimum limit of the territorial jurisdiction of a nation over tidewaters is a marine league from its coasts; * * *." (Emphasis ours.)

At page 264, 11 S.Ct. at page 564,

"The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the State."

After discussing United States v. Bevans, 3 Wheat. 336, 16 U.S. 336, 4 L.Ed. 404, the court states:

"*Within what are generally recognized as the territorial limits of States by the law of nations,* a State can define its boundaries on the sea and the boundaries of its counties; * * *." (Emphasis ours.)

The international rules and acts of nations would appear to limit the territorial waters of a state (country) to a belt one marine league off the shores of the mainland and a similar belt around off-shore islands which are a part of the state.

The practice of countries with regard to the extent of territorial waters in straits rests in most instances on treaty arrangements relating thereto, although there is a tendency to recognize the right of a state to extend its territorial waters or its national waters respectively, beyond the usual limit in straits whose coasts both are owned by it, or in particularly vulnerable places. 1 Brüel, International Straits, 100–101 (1947).

Sir Hersh Lauterpacht, writing in 1 Oppenheim, International Law at 511 (8th ed. 1955), states that straits wider than six miles can only be considered territorial where they can be commanded by coastal batteries. He considers The Dardanelles an example of special treaty arrangement (at pp. 513–16).

With respect to islands, the text writer, Evensen, in Certain Legal Aspects Concerning the Delimitation of the Territorial Waters of Archipelagos, U.N.Doc. A/Conf. 13/18, in 1 Off.Rec. 289, 297, observes that the United States' attitude on the marginal seas surrounding islands is considered very strict. The United States considers that an island has the same marginal belt as any other coastline, not subject to extension to include gaps or enclaves between islands and the mainland.

██ It appears to the court in the case at bar that, having in mind the au-

thorities and treatises referred to and discussed hereinabove, it must be concluded that the deaths involved were on the high seas within the terms and provisions of the Death on the High Seas Act and that the waters of the Santa Barbara channel, between a belt one marine league in width from the shore of the mainland and a belt of the same width around each island, are not territorial waters of the State of California within the purview of said Act, and the court so finds.