James A. CHUTE, Administrator of the Estate of James L. Chute, and Helen L. Dotteridge, Administratrix of the Estate of Harlan Lincoln Matthews

v.

UNITED STATES of America.

Civ. A. No. 72–3412–F.

United States District Court, D. Massachusetts.

Nov. 30, 1978.

See also, D.C., 449 F.Supp. 172.

Joseph G. Abromovitz, Latti & Flannery, Boston, Mass., for plaintiffs.

David V. Hutchinson, U. S. Dept. of Justice, Washington, D. C., Bruce A. Singal, Asst. U. S. Atty., Boston, Mass., for defendant U. S.

## OPINION

FREEDMAN, District Judge.

After a trial by this court on the issue of liability in the above entitled action, the defendant, the United States, was held liable for the wrongful deaths of Dr. James L. Chute and Mr. Harlan L. Matthews, guest passengers on the yacht, the AD LIB II, which sank on September 30, 1971 in Nantucket Sound when it struck the wreck of a Navy ship, the PC1203.[1] The plaintiffs, James A. Chute, the son and the administrator of the estate of Dr. Chute, and Helen L. Dotteridge, the daughter and the administratrix of the estate of Mr. Matthews, now seek an award of damages. Specifically, the plaintiffs seek compensation for the pecuniary loss and loss of society resulting from the deaths of Dr. Chute and Mr. Matthews, as well as funeral expenses. The plaintiffs also claim that they are entitled to recover damages for the conscious pain and suffering of the decedents. A non-jury trial on the issue of damages was held on August 14, 1978.

In order to compute the damages award, this court must first determine the proper measure of damages. The court will initially decide whether the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* (DOHSA), or the federal general maritime law provides the measure of damages for those items of damages sought by the plaintiffs which are usually compensable in a wrongful death action. Then, the court will ascertain what measure of damages is controlling with respect to the plaintiffs' claim for compensation for the decedents' pain and suffering, an element of damages usually recoverable in a survival action.[2]

---

1. The opinion of this court issued on February 17, 1978 sets forth fully this court's findings of fact and conclusions of law on the liability issue. That opinion is reported at 449 F.Supp. 172 (D.Mass.1978).

2. A wrongful death action is a cause of action distinct from a survival action. *Barbe v. Drummond,* 507 F.2d 794, 800 (1st Cir. 1974), *citing, Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 575-76 n. 2, 94 S.Ct. 806, 39 L.Ed.2d 9

I. *Wrongful Death Measure of Damages: DOHSA applies.*

Section 1 of the Death on the High Seas Act provides in pertinent part that

> [w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State . . . the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 U.S.C. § 761. Recovery under DOHSA is limited to a "fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. § 762. While the statutory remedy created by DOHSA applies by its terms when the wrongful act has occurred on the high seas beyond a marine league from the shore of any state, a federal nonstatutory cause of action for wrongful death under general maritime law was recognized by the United States Supreme Court in the 1970 case of *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 409, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which applies to tortious deaths on state territorial waters. *Id.* at 377, 90 S.Ct. 1772.[3] Although in *Moragne* the Supreme Court expressly left open "particular questions of the measure of damages," *id.* at 408, 90 S.Ct. at 1792, in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), a sharply divided Court outlined some of the elements of damages under the new mari-

time wrongful death remedy. That Court found that recovery may be had for loss of support, services and society,[4] and that damages for funeral expenses may be awarded "in circumstances where the decedent's dependents have either paid for the funeral or are liable for its payment." *Id.* at 591, 94 S.Ct. at 818. Most recently, in *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), however, the Supreme Court made it clear that the items of damages permitted in *Gaudet* did not supplement the damages available in wrongful death actions arising on the high seas which are governed by the DOHSA rule that recovery be limited to pecuniary loss. *Id.* at 622–626, 98 S.Ct. 2010. It would therefore appear that if the instant action comes within the scope of DOHSA, the damages award for those items usually recoverable in a wrongful death action must be limited to pecuniary loss.

This court concludes that DOHSA, and not the general maritime remedy created in *Moragne,* provides the measure of damages in this action with respect to those elements of damages ordinarily compensable in a wrongful death action. DOHSA applies where the wrongful act occurred "beyond a marine league from the shore of any state," 46 U.S.C. § 761, that is, 3 miles from shore, *Mobil Oil Corp. v. Higginbotham, supra* at 620, 98 S.Ct. 2010, measured in nautical miles, or approximately 3.45 statute miles, *Hooker v. Raytheon Co.,* 212 F.Supp. 687, 689 (S.D.Cal.1962). In the instant case, both parties agree that the AD LIB II accident occurred at least 4.5 nautical miles from shore, Tr. at 4, 7 (August 14, 1978), in Nantucket Sound.[5]

(1974). Those elements of damages ordinarily recoverable in the wrongful death type of action include loss of support, loss of financial contributions, loss of inheritance, loss of services, and loss of society, *see* Dobbs, Remedies §§ 8.3–8.5 (1973), while recovery for loss of wages, medical expenses, and the pain and suffering of a decedent between the time of injury and death are items of damages in the survival type of action. *See* Dobbs, Remedies § 8.2 (1973). *See generally* Prosser, Law of Torts § 127 (4th ed. 1971).

3. The right of recovery in *Moragne* was based upon a theory of unseaworthiness. 398 U.S. at 376–77, 90 S.Ct. 1772.

4. The Court, however, did not permit an award of damages for mental anguish and grief. 414 U.S. at 585 n. 17, 94 S.Ct. 806.

5. The plaintiffs stated in their brief on the damages issues that the AD LIB II went down over 5 nautical miles from the nearest shore. Plaintiffs' Brief on Damages at 10.

While conceding that the AD LIB II went down over a marine league from shore, the plaintiffs argue that DOHSA does not apply for other reasons. This court, however, is not persuaded by the plaintiffs' arguments. First, the plaintiffs contend that the defendant's "wrongful act" was not the failure to adequately mark or remove the wreck, but was rather the *decision* not to better mark or remove the wreck, which decision was made ashore and not over a marine league from a state's shore. There is authority, however, in this District for the view that "the foundation of the right to recover [under DOHSA] is a wrongful act or omission *taking effect* on the high seas." *Lacey v. L. W. Wiggins Airways, Inc.,* 95 F.Supp. 916, 918 (D.Mass.1951) (emphasis supplied). *See also Wilson v. Transocean Airlines,* 121 F.Supp. 85, 92 (N.D.Cal. 1954). Thus, in the *Lacey* case, allegations that the respondent had either failed to inspect or negligently inspected a plane or failed to notify the plane's owner of a discovered defect, while the craft was on land, which resulted in the plane's going down more than a marine league from shore, were found to state a cause of action under DOHSA as the wrongful act was consummated wholly upon the water. 95 F.Supp. 917–18. I believe that the analysis employed in *Lacey* applies to the case at bar. Although the government's decision not to adequately mark or destroy the wreck may have been made ashore, the wrongful act was consummated and, hence, "occurred" within the meaning of the statute over a marine league from shore where the AD LIB II struck the wreck of the PC1203 in the waters of Nantucket Sound.

■ Secondly, the plaintiffs maintain that the federal general maritime remedy for wrongful death and not DOHSA is controlling because the location of the accident was in Nantucket Sound within the territorial waters of Massachusetts.[6] Although the plaintiffs have not elaborated upon this argument, this court notes that the Com-

monwealth of Massachusetts has, by statute, established its marine boundaries so as to embrace all of Nantucket Sound. M.G.L. ch. 1, § 3. That statutory provision states that "[t]he marine boundaries of the commonwealth in the area of Nantucket Sound shall be drawn to include the entire area of Nantucket Sound as territorial waters of the commonwealth." *Id.* This court also recognizes that DOHSA does not apply to state territorial waters, *Mobil Oil Corp. v. Higginbotham, supra* at 621, 98 S.Ct. 2010, *Moragne v. States Marine Lines, supra,* 398 U.S. at 397–98, 90 S.Ct. 1772, and that section 7 of DOHSA is an exception clause which provides that

[t]he provisions of any state statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any state, or to any navigable waters in the Panama Canal Zone.

46 U.S.C. § 767. Consequently, if Nantucket Sound is regarded by this court as state territorial waters or as "waters within the territorial limits" of Massachusetts, DOHSA would be inapplicable to the present case.

■ Despite the unambiguous language of section 3 of M.G.L. ch. 1, this court declines to rule that Nantucket Sound in its entirety constitutes "state territorial waters" or "waters within the territorial limits of a state" so as to preclude the application of DOHSA to the instant action. Support may be found in the case of *Hooker v. Raytheon Co., supra,* wherein another federal district court was confronted with a parallel situation. That court held that deaths which resulted when a vessel sank in the waters of Santa Barbara Channel beyond one marine league from the mainland of California and over one marine league from the nearest channel island occurred "on the high seas within the terms and provisions of the Death on the High Seas Act." *Id.* at 694. Although the California

---

**6.** The plaintiffs alleged in their complaint and the defendant admitted in its answer that the wreck was submerged on or about Horseshoe Shoals off Cape Cod in the navigable territorial waters of the Commonwealth of Massachusetts.

legislature had determined that the seaward boundary of the State of California extended to three nautical miles from the outer sides of the outer-most of the islands off California's coast and, hence, included waters more than three nautical miles from either the Santa Barbara Islands or the California mainland, the District Court also decided that "the waters of the Santa Barbara channel, between a belt one marine league in width from the shore of the mainland and a belt of the same width around each island, [were] not territorial waters of the State of California," *id.,* for purposes of DOHSA. *Id.* While the rationale of the District Court's decision in *Hooker* was not succinctly stated, that court reasoned that a state's territorial waters have traditionally been limited by the international rules and acts of nations to a zone one marine league from the mainland or around any offshore islands which are part of the state.[7] *Id.* at 693. Consonant with the result and this reasoning in the *Hooker* case, this court rules that the waters of Nantucket Sound beyond a marine league from either the shore of mainland Massachusetts (or Cape Cod) and the offshore islands are not territorial waters of Massachusetts for DOHSA purposes.[8]

The Congressional history of DOHSA does not seem to call for a different outcome. In particular, the final debate in the House of Representatives before the passage of DOHSA in no way reflects a legislative view that a state's territorial waters could extend beyond a marine league from a state's shore. *See* 59 Cong.Rec. 4482–86 (1920). Moreover, references to section 7 indicate to this court that that section was primarily intended to exclude from DOHSA's coverage rivers such as the Mississippi River and lakes such as the Great Lakes which, unlike Nantucket Sound, may, without a doubt, be described as inland or landlocked navigable bodies of water. *See* 59 Cong.Rec. 4483 (remarks of Rep. Mann, Rep. Volstead and Rep. Connally); 59 Cong. Rec. 4486 (remarks of Rep. Montague).[9]

■ Finally, the plaintiffs assert that DOHSA does not apply to the instant action because the accident occurred on a four-foot shoal and not on the high seas. DOHSA, however, does not expressly require a minimum depth of the waters where the wrongful act occurred and the plaintiffs do not point to any authority which interprets DOHSA to that effect. On the contrary, a fair reading of the statutory language would suggest that the term "high seas" is modified in a definitional sense by the further descriptive phrase "beyond a marine league from the shore of any state" so that waters whether a few feet or several hundred feet deep, beyond the 3-mile limit would come within the term "high seas."[10]

### A. *Pecuniary Loss*

■ Because DOHSA and not the federal general maritime remedy is controlling, the

---

**7.** The *Hooker* court cited as one of the authorities for its decision the United States Supreme Court case of *Manchester v. Massachusetts,* 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), in which the Court decided that the Commonwealth of Massachusetts could "include Buzzard's Bay within the limits of its counties." *Id.* at 264, 11 S.Ct. at 564.

**8.** This ruling, of course, is limited to the factual setting and damages issues presented in this case.

**9.** The debate in the House of Representatives immediately preceding the passage of DOHSA focused mainly on the meaning of the first sentence of section 7. That sentence originally read: "the provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this act as to causes of action accruing within the territorial limits of any State." 59 Cong.Rec. 4482 (1920).

However, a last minute amendment proposed by Representative Mann was passed which deleted the limiting phrase "as to causes of action accruing within the territorial limits of any State." The object of the Mann amendment was, apparently, the preservation of state law remedies for wrongful death beyond the 3-mile limit, *see* 59 Cong.Rec. 4484 (remarks of Rep. Mann); *Wilson v. Transocean Airlines, supra* at 90, although the first sentence of section 7 has not been interpreted in that manner. *See Barbe v. Drummond, supra* at 801 n. 10 and cases cited therein.

**10.** This view is consistent with the statement of Rep. Volstead during the final House debate on DOHSA that "[a]nything beyond the 3-mile limit is considered as on the high seas." 59 Cong.Rec. 4482 (1920).

plaintiffs' recovery of those items of damages usually compensable in a wrongful death action is restricted to pecuniary loss, which is the amount a beneficiary might reasonably have expected to receive if the decedent had lived.[11] This amount, however, cannot be calculated in monetary terms with absolute precision. *Petition of Risdal & Anderson, Inc.*, 291 F.Supp. 353, 357 (D.Mass.1968). As one Court of Appeals has observed, "[i]nsistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience." *Whitaker v. Blidberg Rothchild Co.*, 296 F.2d 554, 555 (4th Cir. 1961).

▮▮▮ In the present action, only two individuals for whose benefit the action was commenced are claiming direct pecuniary losses: Eunice Chute, as a result of the death of Dr. Chute, and Helen Dotteridge, as a result of Mr. Matthews' death. The claim of pecuniary loss on the part of Mrs. Eunice Chute, the widow of Dr. Chute, has been characterized as one for both loss of services and loss of support. With respect to Mrs. Chute's claim for loss of services, I believe she is entitled to recover a substantial sum. Loss of services is an item of damages allowable under DOHSA. *See Sea-Land Services, Inc. v. Gaudet, supra* 414 U.S. at 585, 94 S.Ct. 806. The evidence showed that at the time of Dr. Chute's death, he was 75 years old and Mrs. Chute was age 79. Tr. at 10–11 (August 14, 1978). Dr. Chute had been retired for approximately 10 years. Tr. at 12 (August 14, 1978). Prior to his death Dr. Chute took care of Mrs. Chute who had had a CVA (presumably a cardiovascular attack) some years earlier and was incapable of running their household. Dr. Chute also performed such household duties as shopping and cooking. Tr. at 12 (August 14, 1978). According to the testimony of Roseanna Chute, Dr.

Chute had planned that he and Mrs. Chute would go into a nursing home together when he could no longer take care of Mrs. Chute. After Dr. Chute's death Mrs. Chute was cared for either by companions or nurses aides or in a nursing home. Tr. at 13, 16 (August 14, 1978).

As Dr. Chute was a retired physician, it may reasonably be concluded that he provided services equivalent to those that were provided by the personnel of a nursing home and nursing companions for Mrs. Chute after Dr. Chute's death. However, because of Dr. Chute's age it is far from certain that he would have been able to provide such services to Mrs. Chute for the rest of his life. Furthermore, Dr. Chute expected at some point to enter a nursing home with his wife. Both parties agreed that the life expectancy of a person of Dr. Chute's age according to mortality tables was 8.1 years. Tr. at 52 (August 14, 1978). Evidence offered by Dr. Chute's children, Roseanna Chute and David A. Chute, revealed that Dr. Chute was physically capable of engaging in a variety of activities such as hunting, fishing, rowing and driving a beach buggy up until the time of his death, Tr. at 29–31 (August 14, 1978), that Dr. Chute had had no major health problems within the decade before his death except angina, Tr. at 27, 30 (August 14, 1978), and that Dr. Chute's parents had lived "into their late 80's," Tr. at 18 (August 14, 1978), so that Dr. Chute probably would have lived for another 8.1 years. Because of Dr. Chute's advanced age, however, this court finds that he would have been able to continue to provide household and nursing services for his wife for only approximately five of the remaining 8.1 years of his life. Mrs. Chute's award for the loss of services of Dr. Chute is therefore based on the figures provided by Roseanna Chute which detailed the costs of nursing

---

11. The statutory command states in full:

The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought.
42 U.S.C. § 762.

care for Mrs. Chute for the years from 1971 to 1976 which were as follows:

| | |
|---|---|
| From Oct. 1, 1971 | $ 323.94 |
| 1972 | 7,256.00 |
| 1973 | 6,200.00 |
| 1974 | 8,154.00 |
| 1975 | 8,191.00 |
| 1976 | 8,068.00 |
| | $38,192.94 |

The total of $38,192.94 represents not only the monetary value of the services which Dr. Chute would have provided for his spouse but for his wrongful death, but also covers the cost of food [12] and Mrs. Chute's housing at the nursing home. These additional items are included in the total sum because they constitute expenses necessarily incurred by Mrs. Chute in obtaining substitute nursing care. *See generally,* S. Speiser, Recovery for Wrongful Death § 4:6 at 433; § 3:46 at 295 (2d ed. 1975) (hereinafter Speiser).[13]

With regard to her claim for loss of support, this court finds that Mrs. Chute may, likewise, make a recovery. Loss of support which "includes all the financial contributions that the decedent would have made to his dependents," *Sea-Land Services, Inc. v. Gaudet, supra* at 584–85, 94 S.Ct. at 814, is an item of damages allowed under DOHSA. *See The S.S. Black Gull,* 90 F.2d 619, 620–21 (2d Cir. 1937). In the instant action, the claim for loss of support is only for the cost of clothing, toiletries and other incidental expenses of Mrs. Chute which would not be included in the monies spent for her nursing care.[14] The average gross income of Dr. Chute for the four years before his death was about $11,481.[15] Roseanna Chute testified that the Chutes spent about $7,500 annually on their living expenses, Tr. at 27–28 (August 14, 1978), and other evidence disclosed that Dr. Chute provided the sole source of income for Mrs. Chute, Answers of the plaintiff, James A. Chute, to interrogatories propounded by the defendant, the United States, # 8, # 9, # 10 and # 24, (filed June 27, 1973) so that approximately one-half of the $7,500 or $3,750 was contributed by Dr. Chute to Mrs. Chute's support on a yearly basis. The figure of $3,750, however, represents all of the living expenses of Mrs. Chute and would include major expenses such as. food costs. I believe that only one-fourth of this figure or $937.50 would have been spent annually on Mrs. Chute's incidental living expenses such as toiletries and clothing. As Dr. Chute supported Mrs. Chute from the time when he was in medical school many years ago, Tr. at 21 (August 14, 1978), it may reasonably be concluded that Dr. Chute would have continued to provide for his wife's support for his remaining years. This court, therefore, finds that Dr. Chute would have contributed $937.50 for his 8.1 remaining years to Mrs. Chute for her incidental

12. There was some confusion during the testimony of Roseanna Chute with respect to the estimated cost of food for Mrs. Chute's companion for the 22 months during which a companion lived with Mrs. Chute, and the government objected to the proposed use of a $120 per month figure rather than a $50 per month figure as speculative. Tr. at 20 (August 14, 1978). Because the plaintiffs offered no factual basis for the higher figure and the government objected to the higher figure, this court will not add in the higher figure to the total of $38,-192.94 for the years 1971 to 1976.

13. As Mrs. Chute prevails on her claim for loss of services, I find it unnecessary to reach plaintiffs' alternate contention that the three Chute children suffered a loss of inheritance.

14. The plaintiffs explicitly limited their request for loss of support to incidental living expenses such as the cost of clothing and toiletries. For unstated reasons, the plaintiffs did not specifi-

cally seek compensation for the costs of Mrs. Chute's nursing care after the period when the court finds that Dr. Chute would no longer have been able to care for Mrs. Chute. *See* Tr. at 15 (August 14, 1978); Plaintiffs' Brief on Damages at 6. In view of his average income for the four full years before his death, *see* note 15 *infra,* however, it is uncertain how he would have paid for the nursing home costs of both himself and his wife from 1977 on, at the figure of approximately $8,000 per year per person.

15. This figure is derived from a statement of his gross income for the four full years before his death:

| | | |
|---|---|---|
| 1967 | – | $15,000 |
| 1968 | – | $11,264 |
| 1969 | – | $ 9,510 |
| 1970 | – | $10,153 |

Answers of plaintiff, James A. Chute, to interrogatories propounded by the defendant, the United States, # 19 (filed June 27, 1973).

living expenses if he had lived, which amounts to $7,593.75. As approximately one-eighth of this sum or $937.50 must be discounted to present value,[16] this figure is reduced to $7,556.25. This court also finds that Dr. Chute would have either paid for Mrs. Chute's medical expenses of $2,438 for the period from 1971 to 1978, Tr. at 19 (August 14, 1978), or provided equivalent medical care so that Mrs. Chute will be awarded $7,556.25 plus $2,438 or the total sum of $9,994.25 for loss of support.[17]

 The other individual claiming a pecuniary loss is Helen Dotteridge, Mr. Matthews' daughter, who seeks to recover her loss of the financial contributions of Mr. Matthews which amounted to about $20 to $25 per week. Although a surviving child need not prove dependency on the decedent in order to recover under DOHSA, *Petition of Risdal & Anderson, Inc., supra* at 356, this court determines that Helen Dotteridge's claim for loss of financial contributions must fail. The evidence showed that Mr. Matthews had lived with his daughter, Helen Dotteridge, from May 1970 to the end of November of that year and then from April 1, 1971 to the date of his death, and that Mr. Matthews intended to live with the Dotteridge family for about 7 to 8 months out of every year. Tr. at 40 (August 14, 1978). Although the $20 to $25 weekly contributions made by Mr. Matthews to Helen Dotteridge were, according to Helen Dotteridge's testimony, volunteered by Mr. Matthews, Mrs. Dotteridge also indicated that Mr. Matthews made the contributions because he felt that he should give something toward the household expenses as did the Dotteridge children. Tr. at 43, 46 (August 14, 1978). Furthermore, the $20 to $25 weekly contributions of Mr. Matthews were used by Helen Dotteridge for "expenses for cooking and providing things." Tr. at 46 (August 14, 1978). It thus appears to this court that the $20 to $25 weekly contribution of Mr. Matthews represented payment for the cost of Mr. Matthews' maintenance (his food and living expenses) at the Dotteridge home. Consequently, Helen Dotteridge did not suffer an actual pecuniary loss as a result of Mr. Matthews' death and damages may not properly be awarded to her.[18]

### B. *Loss of Society*

 The plaintiffs also claim damages on behalf of certain of the relatives of the

---

16. The amount of damages recovered for the period from the time of death to the time of a court's determination of damages are awarded in full and not reduced to present value. *See* Speiser § 8:3 at 708 and n. 20. I have used a 4% discount rate.

17. The government urged that Mrs. Chute suffered no loss of support as she has been supported since Dr. Chute's death by the income from securities which was used to support both Dr. and Mrs. Chute before his death. The evidence supporting the government's contention was *inter alia* Roseanna Chute's testimony at the trial on damages:

Q. Miss Chute, is it correct that the funds used to maintain your mother are funds received from the stocks your father had?
A. Yes and Social Security
Q. And Social Security
A. Minimum.

Tr. at 25 (August 14, 1978). While the government's argument is appealing, it ignores the rule of damages that benefits received as an heir of a decedent's estate are not deducted from the amount of the recovery against a defendant in a wrongful death action. *See* Speiser § 6:11 at 680. Although there is some older state authority which has not followed that rule, *see San Antonio & A. P. Ry. Co. v. Long*, 87 Tex. 148, 27 S.W. 113 (1894), that authority has been strongly criticized, *see McLaughlin v. United R.Rs.*, 169 Cal. 494, 147 P. 149 (1915) and the rule has been applied in an action where the wrongful death measure of damages was pecuniary loss. *Circle Line Sightseeing Yachts, Inc. v. Storbeck*, 325 F.2d 338, 340 (2d Cir. 1963) (applying New York law). While I find it difficult to reconcile the rule with the actual pecuniary loss standard of damages of DOHSA, *see Petition of United States*, 418 F.2d 264, 272–73 (1st Cir. 1969), this court believes it must apply the rule and permit Mrs. Chute to recover for loss of support. The court also wishes to point out that receipt of social security benefits by the decedent's survivor also will not mitigate damages. *See* Speiser § 6:9 at 673.

18. There is at least one other problem with the claim of Helen Dotteridge for the loss of Mr. Matthews' weekly financial contributions. The plaintiffs did not provide evidence to demonstrate that Mr. Matthews had and would have continued to have an income of a specified amount during his remaining years.

decedents for their loss of society. The individuals claiming to have experienced loss of society as a result of Dr. Chute's death are his widow, Eunice Chute, his daughter, Roseanna Chute, and his two sons, David Chute and James Chute. Mr. Matthews' two daughters, Helen Dotteridge and Jean Perry, claim to have suffered loss of society as a result of his death. In the *Higginbotham* case, *supra*, the Supreme Court ruled that although damages for loss of society may be recovered under the general maritime law, loss of society damages could not be awarded in an action governed by DOHSA. 436 U.S. 618 at 625, 98 S.Ct. 2010, 56 L.Ed.2d 581. Accordingly, as this court has determined that DOHSA applies, the plaintiffs are not entitled to recover damages for loss of society in the instant action.[19]

### C. *Funeral Expenses*

▮ In addition, the recovery of funeral expenses is sought by the plaintiffs. It has been the rule in this Circuit since the decision in *Barbe v. Drummond*, 507 F.2d 794 (1st Cir. 1974), that the "pecuniary loss" concept embodied in DOHSA does not include funeral expenses. *Id.* at 801–02. Although Justice Stevens, writing for the majority in the *Higginbotham* case, *supra*, suggested in dicta that "the cost of the funeral could also be considered a pecuniary loss suffered by [a] dependent as a result of the death," 436 U.S. at 624 n. 20, 98 S.Ct. at 2015, that result apparently only obtains where the claimants have paid or will pay for the decedent's funeral,[20] *id.*, and not where the estate has paid for the funeral. In this case, the evidence revealed that both the estate of Dr. Chute and the estate of Mr. Matthews paid the funeral expenses incurred as a result of the deaths of Dr. Chute and Mr. Matthews respectively. Tr. at 36, 47 (August 14, 1978). Thus, the

plaintiffs' claim for recovery of funeral expenses must also be rejected.

### II. *Survival Measure of Damages: Federal maritime law applies.*

▮ A final claim pressed by the plaintiffs is for recovery for the conscious pain and suffering experienced by Dr. Chute and Mr. Matthews prior to their deaths. With respect to this claim, the court believes that federal maritime law provides a remedy. Although it is well settled that DOHSA does not allow recovery for a decedent's pain and suffering, *Barbe v. Drummond*, *supra* at 797, *Decker v. Moore-McCormack Lines, Inc.*, 91 F.Supp. 560 (D.Mass.1950), in *Barbe v. Drummond*, *supra*, the First Circuit recognized "a federal maritime survival action created by decisional law for pain and suffering prior to death," 507 F.2d at 799, which applies to deaths on the high seas. The government insists, however, that the recent decision in *Mobil Oil Corp. v. Higginbotham*, *supra*, bars any recovery other than that permitted by DOHSA's pecuniary loss measure of damages in an action coming within the compass of DOHSA. Although *Higginbotham* could be read broadly to support the government's view, this court agrees with the plaintiffs that, upon careful examination, the *Higginbotham* decision does not preclude the judicial recognition of a federal survival action for antemortum pain and suffering. As Justice Stevens pointed out in *Higginbotham*, *supra*, "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." 436 U.S. at 625, 98 S.Ct. at 2015. Because DOHSA is a wrongful death statute and not a survival statute, the federal courts are free to fill what would otherwise be a legislative void by creating a federal survival action for pain and suffering which would apply to deaths on the high seas. *Barbe v. Drum-*

---

19. Therefore, the evidence offered by the plaintiffs relevant solely to the issue of the damages sustained on the basis of the claims of loss of society will be disregarded by this court.

20. These are the circumstances in which funeral expenses may be allowed under the general maritime law remedy. *See* page 3 *supra*.

mond, supra at 799–800. In *Barbe v. Drummond, supra,* the First Circuit decided to fill that legislative void and this court is bound to follow that decision. I therefore find that the plaintiffs may recover damages for the pain and suffering of the decedents where proven pursuant to federal maritime law.

■■■ The evidence disclosed that when the passengers of the AD LIB II were forced into the water, they each put on life jackets and all but Mr. Ohrn were tied by a rope to a floating ice chest. Some time later, Mr. Matthews swallowed some water and he regurgitated. Apparently, he said he felt "better." Tr. at 55 (August 14, 1978). Then the others heard him snoring. When Dr. Chute checked Mr. Matthews' pulse, he found that Mr. Matthews had died. The cause of Mr. Matthews' death stated on his death certificate was drowning. Unlike Mr. Matthews, Dr. Chute survived until the morning following the accident. After drifting for about four hours, Dr. Chute was picked up with the others by the C/C JOHNNY B IV and then taken aboard a Coast Guard vessel, the POINT TURNER. Because Dr. Chute was reluctant to be airlifted by helicopter to a hospital, he was taken ashore by the POINT TURNER and then transported by ambulance to the Falmouth Hospital. A hospital record stated that the nurse attending Dr. Chute reported that the "patient was fine, had no problems, had good night, slept well." Tr. at 54 (August 14, 1978). Dr. Chute died in his hospital bed. The cause of Dr. Chute's death was stated on his death certificate as "coronary insufficiency following immersion and exhaustion after boat accident at sea."

In light of this evidence, it is reasonable to draw the conclusion that between the time of the boating accident and the time of their deaths both the decedents experienced conscious pain and suffering. Although he stated that he felt "better" shortly before he perished, clearly Mr. Matthews engaged in a struggle to save himself before he drowned. His struggle may have been relatively short-lived, yet it must also have been a painful, even ghastly experience.[21] While Dr. Chute did not drown but managed to stay alive until the following day and appeared "fine" to his attending nurse the next morning, I believe he also experienced some pain and suffering, although less intense than that experienced by Mr. Matthews. Dr. Chute, aged 75, spent some four hours drifting in the waters of Nantucket Sound during which time he witnessed the death of one of the other members of the party that had been aboard the AD LIB II. Acknowledging the great difficulty in placing a price tag on pain and suffering, this court finds that an award of $2,500 should be allowed for Mr. Matthews and $1,250 for Dr. Chute.

### III. *Award.*

■■■ A further item of damages which the plaintiffs may recover is prejudgment interest on the sums past due. Allowance of prejudgment interest in admiralty is in the discretion of the trial court. *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 592 (2d Cir. 1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526, 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806 (1962). This court has decided to allow prejudgment interest at an annual rate of 4% which is less than the full legal rate. *See Petition of Risdal & Anderson, Inc., supra,* at 358. Such interest runs from the dates on which the sums due would have accrued. *Id.*

The court therefore awards the following:

*See Petition of Marina Mercante Nicaraguense, S. A.,* 248 F.Supp. 15, 28 and n. 34 (S.D.N.Y. 1965), *modified on other grounds,* 364 F.2d 118 (2d Cir. 1966), and cases cited therein.

---

21. Although it is uncertain how much time elapsed before Mr. Matthews drowned, other courts have made substantial awards for a decedent's pain and suffering when the decedent died by drowning within a matter of minutes.

As a result of Dr. Chute's
death to:

Mrs. Eunice Chute

 Loss of services ..... $38,192.94
 Plus interest ........ 6,005.14
 $44,197.98

 Loss of support ......$ 9,994.25
 Plus interest ........ 1,391.32
 11,385.57
 Total ................ $55,583.55

Estate of Dr. Chute

 Pain and suffering ...$ 1,250.00
 Plus interest ........ 350.00
 Total ................ $ 1,600.00

As a result of Mr. Matthews'
death to:

Estate of Mr. Matthews

 Pain and suffering ...$ 2,500.00
 Plus interest ........ 700.00
 Total ................ $ 3,200.00

Judgment shall enter in accordance with the foregoing opinion.